**CITY OF PHILADELPHIA, Petitioner,**
v.
**CIVIL AERONAUTICS BOARD,**
Respondent,
The Flying Tiger Line, Inc., Intervenor.
No. 15845.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 3, 1961.

Decided March 23, 1961.

Mr. William J. Duiker, Washington, D. C., with whom Mr. David Berger, Philadelphia, Pa., was on the brief, for petitioner.

Mr. Robert L. Toomey, Attorney, Civil Aeronautics Board, with whom Messrs. Franklin M. Stone, General Counsel, Civil Aeronautics Board, John H. Wanner, Deputy General Counsel, Civil Aeronautics Board, O. D. Ozment, Associate General Counsel, Litigation and Research, Civil Aeronautics Board, and Richard A. Solomon, Attorney, Department of Justice, were on the brief, for respondent.

Mr. Elmer E. Batzell, Washington, D. C., with whom Mr. Norman L. Meyers, Washington, D. C., was on the brief, for intervenor. Mr. Ivan V. Kerno, Washington, D. C., also entered an appearance for intervenor.

Messrs. Bryce Rea, Jr., Thomas M. Knebel, Washington, D. C., and Frederick G. Freund, Washington, D. C., filed a brief on behalf of National Motor Freight Traffic Association, as amicus curiae, urging reversal.

Before WILBUR K. MILLER, Chief Judge, and BAZELON and FAHY, Circuit Judges.

WILBUR K. MILLER, Chief Judge.

■ The Flying Tiger Line, Inc., operates a transcontinental air freight service under the authority of a certificate issued by the Civil Aeronautics Board in 1949, 10 C.A.B. 572, 635, and renewed from time to time with alterations not relevant here. The certificate authorized Tiger "to engage in air transportation with respect to property" between the Pacific Coast terminal point of Los Angeles, various intermediate points, and the eastern terminal point of Portland, Maine. Philadelphia is one of the numerous intermediate points enumerated in the certificate. It follows that Tiger is authorized to engage in interstate air transportation of freight, including movements between Philadelphia and the Pacific Coast, as well as between Philadelphia and intermediate points.

For several years Tiger operated large aircraft between San Francisco and Detroit, Los Angeles and New York, and Los Angeles and Cleveland. Freight destined for or picked up at intermediate points such as Philadelphia was moved by smaller aircraft (C–46) scheduled to connect with the large transcontinental planes. Under this arrangement Philadelphia's outbound freight reached the Los Angeles area in time for second morning delivery; inbound freight was similarly timed. The maximum lift capacity in or out of Philadelphia in any one day was 13,000 pounds.

Having suffered financial loss in its transcontinental operations with feeder planes, which it attributed to the slow schedule, Tiger filed with the C. A. B. on September 30, 1957, a formal proposal to change its service pattern by providing larger, faster aircraft on its main route, by eliminating the C–46 feeder planes, and by furnishing truck deliveries between the landing places of the larger planes and the intermediate points. With respect to Philadelphia,[1] Tiger proposed service by truck to and from the Newark Airport (about 90 miles away) which would make available to Philadelphia shippers first morning delivery in San Francisco and first day delivery at other West Coast points. Under the proposed arrangement, lift capacity would be much larger than before. The City of Philadelphia, its Chamber of Commerce, and one air line protested.

---

1. Similar arrangements for other intermediate points are not involved here.

On December 18, 1957, the Board set the application for formal hearing, but authorized Tiger to serve Philadelphia by truck through Newark until 60 days after its final decision on the application. Thereupon Tiger discontinued its feeder plane service to and from Philadelphia and instead began to move that city's freight by truck to and from the Newark Airport where the transcontinental air journey began or ended.

At a prehearing conference January 14, 1958, it was agreed that the case should proceed "on the basis that FTL [Tiger] is conducting its trucking operations under lawful authority." It was also stipulated, with respect to Philadelphia, that the issue is "Whether or not the Flying Tiger Line, Inc.'s proposed service to Philadelphia by truck through the Newark Airport would adversely affect the public interest." The prehearing order stated that, in addition to the stipulated issue concerning Philadelphia, that city "raised the question whether the substituted truck service [to] Philadelphia is adequate air service within the meaning of and as contemplated by FTL's certificate of public convenience and necessity."

A hearing was had at which a number of Philadelphia shippers testified. Without exception they said they were pleased with the new service by truck through Newark—which was already in effect—because their shipments to and from the West Coast were delivered sooner than, and just as safely as, under the old feeder plane arrangement. They were interested only in quick, safe delivery; they were not concerned whether the carrier flew the freight from Philadelphia to California or trucked it to Newark and then transported it by air to the Pacific Coast.

After the hearing, the Examiner filed an initial decision, holding that the proposed air-truck service to Philadelphia is adequate within the meaning of Tiger's certificate, that the substituted truck service between Philadelphia and Newark is not adverse to the public interest, and that Tiger's application should be approved. On November 12, 1959, the Board adopted the Examiner's findings, conclusions and recommendations, with slight modifications, and granted Tiger's application to serve Philadelphia by truck to and from the Newark Airport. Its petition for reconsideration having been denied, the City of Philadelphia petitions for review.

█ Philadelphia first contends that Tiger is not providing it "with direct air service as contemplated and required by its Certificate of Convenience and Necessity." The certificate authorizes Tiger "to engage in air transportation with respect to property" between points enumerated therein, including Philadelphia. The City assumes that this means Philadelphia must be served through its International Airport and, in so assuming, reads into the certificate the word "direct" which does not appear in it.

On the contrary, instead of providing that Philadelphia or any other point must be served through its own airport or that which is nearest to the city, the certificate provides as follows:

"Upon compliance with such procedure relating thereto as may be prescribed by the Board, the holder may regularly serve a point named herein through any airport convenient thereto; * * *."

Its prescribed procedures having been complied with, the Board authorized service to Philadelphia through the Newark Airport. If that airport is convenient to Philadelphia, the requirement of the certificate has been met. Service through the airport nearest to the city is not required by the certificate, nor is it provided that the city's own airport must be used.

█ The testimony of Philadelphia shippers that they like the Newark arrangement because it results in early delivery on the West Coast, and that they do not object to the incidental transportation by truck, makes it clear that the Newark Airport is convenient to Philadelphia within the meaning of the Tiger certificate. No inconvenience to

any transcontinental shipper appears. Other transcontinental air freight carriers, competing with Tiger, still offer service at the Philadelphia International Airport to shippers who do not desire to use the Tiger trucking service through Newark, so Philadelphia has not been deprived of direct air service at its own airport. The opposition of the City of Philadelphia is largely based, we suspect, upon the frank admission of its counsel on oral argument that "Our pride has been hurt."

We conclude that the new service pattern permitted by the Board's order is consistent with, and within the meaning of, Tiger's certificate of convenience and necessity.

The City of Philadelphia next contends that the trucking service does not in fact or in law constitute "air transportation" as that term is defined in the Federal Aviation Act.[2] Turning to that statute. we find in § 101(10) the following:

"'Air transportation' means interstate, overseas, or foreign air transportation or the transportation of mail by aircraft."

From this, the petitioner argues that "air transportation" must be entirely by aircraft, and that adjunct truck service such as here involved prevents the transcontinental service furnished by Tiger from being properly described as "air transportation."

Subsection (10) does not purport to define the term "air transportation" with particularity. It simply says the general term "air transportation" includes three specific forms—interstate, overseas and foreign,—and a fourth form, the transportation of mail by aircraft. The fourth form receives no further elaboration in the statute, presumably because none is needed: any transportation of mail by aircraft is "air transportation." But, in merely saying that "'Air transportation' means interstate, overseas, or foreign air transportation," subsection (10) does not really define either of those three forms. It would appear Congress

was well aware of that, for in subsection (21) their exact definitions are supplied:

"(21) 'Interstate air transportation', 'overseas air transportation', and 'foreign air transportation', respectively, mean the carriage by aircraft of persons or property as a common carrier for compensation or hire or the carriage of mail by aircraft, in commerce between, respectively—

"(a) a place in any State of the United States, or the District of Columbia, and a place in any other State of the United States, or the District of Columbia; or between places in the same State of the United States through the airspace over any place outside thereof; or between places in the same Territory or possession of the United States, or the District of Columbia;

"(b) a place in any State of the United States, or the District of Columbia, and any place in a Territory or possession of the United States; or between a place in a Territory or possession of the United States, and a place in any other Territory or possession of the United States; and

"(c) a place in the United States and any place outside thereof;

whether such commerce moves wholly by aircraft or partly by aircraft and partly by other forms of transportation."

The last clause of the foregoing subsection, beginning with the words "whether such commerce," obviously relates to each of the three definitions and, therefore, pertains to the definition of "interstate air transportation" contained in subparagraph (a), as well as to the definitions in subparagraphs (b) and (c). This is so because, as printed in the Statutes at Large, after the indentation of the three subparagraphs, the "whether such commerce * * *" clause is not indented in conformity with

**2.** 72 Stat. 731, 49 U.S.C.A. § 1301.

the indentation of subparagraphs (a), (b) and (c);[3] and because the words "such commerce" can only refer to the word "commerce" in the first paragraph of subsection (21), thus showing that the final clause of the subsection relates to each of subparagraphs (a), (b) and (c). In these circumstances it seems clear that the California-Newark-Philadelphia movement of freight is air transportation notwithstanding the 90-mile link between Newark and Philadelphia served by truck.

The City of Philadelphia also complains that "Neither FTL [Flying Tiger Lines], nor the Ardmore Freight Corporation,[4] is an exempt carrier under the provisions of Section 203(b) 7(a) [303(b) (7a)] of the Interstate Commerce Act." While the point the City seeks to make is not clear, it probably is that the C. A. B. has no authority to authorize Tiger to accomplish truck movements betwen Philadelphia and the New Airport because the I. C. C. has not granted a certificate of exemption, with respect to that truck haul, under 49 U.S. C.A. § 303(b) (7a), which reads:

"Nothing in this chapter * * * shall be construed to include * * * the transportation of persons or property by motor vehicle when incidental to transportation by aircraft; * * *."

It is doubtful whether the City of Philadelphia may thus question the Board's jurisdiction over the highway portion of Tiger's Philadelphia-Newark-California operations because, as heretofore noted, the City expressly agreed at a prehearing conference before the Examiner on January 14, 1958, that the case should proceed "on the basis that FTL [Tiger] is conducting its trucking operations under lawful authority." Assuming, without deciding, that the question may now be presented by the City of Philadelphia, we think the Board adequately and correctly disposed of it in its Order when it said:

" * * * Philadelphia makes the subsidiary argument that the Philadelphia-Newark truck haul is subject to the jurisdiction of the Interstate Commerce Commission. Our finding goes no further than that Flying Tiger Line's proposed service will, as to it, constitute air transportation and that in rendering service through the airports proposed Flying Tiger Line will be fulfilling its obligations under its certificate. We are not asserting jurisdiction over the motor carrier as an air carrier nor are we determining the status of the truck operation under the Interstate Commerce Act. Whether the Philadelphia-Newark truck haul should be considered as incidental to air transportation within the meaning of the Interstate Commerce Act, and thereby exempt from economic regulation under that statute, is a matter for the Interstate Commerce Com-

---

3. Subsection (21) is printed in Appendix A to the brief of the City of Philadelphia as it appears in 49 U.S.C. § 1301. There the final clause, beginning with the words "whether such commerce," is printed as an integral part of subparagraph (c), thus indicating that it does not relate to subparagraph (a) and that therefore it is not a part of the definition of the term "interstate air transportation."

Comparison of the U.S.Code version of subsection (21) with that contained in 72 Stat. at page 738, shows clearly that the Code version is incorrect in adding the final clause to subparagaph (c), and thus apparently restricting its significance to that subparagraph alone. We think the printing of the Statutes at Large should be followed instead of the plainly erroneous version of the Code, and especially so when, as here, the Code version obviously does not express the Congressional intention, since the concluding clause does not logically pertain to subparagraph (c) alone. [It should be noted that the final clause appears in correct form in 49 U.S.C.A. § 1301(21), following subparagraph (c) and not as a part thereof.]

4. Ardmore Freight Corporation is employed and paid by Tiger to transport its Philadelphia air freight to and from the Newark Airport.

mission. We do not intend that our action here should influence what that decision should be. If the Commission should conclude under the standards normally applied by it that the truck operation is not exempt, the trucker must have or obtain the requisite I. C. C. authority in order for Flying Tiger Line to operate in the manner it proposes."

Other arguments made by the City of Philadelphia are minor in character and are rejected without discussion.

Affirmed.