Elmon **WALTERS**, Alix Provence, Charlene Blackshear, and all others similarly situated, Plaintiffs,

v.

**AMERICAN COACH LINES OF MIAMI, INC., a Florida corporation, Defendant.**

No. 07–22000–CIV.

United States District Court, S.D. Florida.

July 29, 2008.

Judgment As to Defendant's Affirmative Defenses Regarding the Motor Carrier Exemption, Statute of Limitations and Liquidated Damages, filed April 17, 2008. (D.E.68.) Defendant filed its Response on May 5, 2008, (D.E.104), to which Plaintiffs replied on May 15, 2008. (D.E.125.) Also before the Court is Defendant's Motion for Summary Judgment, filed April 18, 2008. (D.E.73.) Plaintiffs filed their Response on May 2, 2008, (D.E.100), to which Defendant replied on May 12, 2008. (D.E.121.) The matters are ripe for disposition.

THE COURT has considered the motions and the pertinent portions of the record and is otherwise fully advised in the premises.

Elizabeth B. Hitt, Robert Ader, Law Offices of Robert Ader, P.A., Miami, FL, for Plaintiffs.

Michael W. Casey, III, Richard D. Tuschman, Kevin E. Vance, Epstein Becker & Green, P.C., Miami, FL, for Defendant.

### ORDER ON MOTIONS FOR SUMMARY JUDGMENT

URSULA UNGARO, District Judge.

THIS CAUSE is before the Court upon Plaintiffs' Motion for Partial Summary

## BACKGROUND AND FACTS [1]

Defendant is a motor carrier that provides for-hire ground transportation of passengers. (Def.'s Statement of Material Facts (Def.'s SMF) ¶ 1; Pls.' Statement of Undisputed Facts in Support of their Mot. for Partial Summ. J. (Pls.' SMF) ¶ 1.) Defendant has been in operation since September 2003. (Def.'s SMF ¶ 1.) Plaintiffs are or were bus drivers for Defendant. (Def.'s SMF ¶ 2; Pls.' SMF ¶ 2.) Defendant pays its drivers using a variety of different methods but does not pay any of them at overtime wage rates. (Pls.' SMF ¶ 1.)

1. Defendant has submitted a statement of material facts in support of its Motion, (D.E.74), and Plaintiffs have submitted a response to Defendant's statement of facts. (D.E.101.) Likewise, Plaintiffs have submitted a statement of material facts in support of their Motion, (D.E.69), and Defendants have submitted a Response to Plaintiffs' statement of facts. (D.E.105.) In addition, Plaintiffs have submitted a statement of material facts in opposition to Defendant's Motion. To the extent that Plaintiffs do not controvert the facts alleged by Defendant and those facts are supported by the record, the Court adopts the facts contained within Defendant's statement. Likewise, to the extent that Defendant does not controvert the facts alleged by Plaintiffs and those facts are supported by the record, the Court adopts the facts contained within Plaintiffs' statement. *See* S.D. Fla. L.R. 7.5.D ("All material facts set forth in the movant's statement filed and supported as required by Local Rule 7.5.C will be deemed admitted unless controverted by the opposing party's statement . . .").

Defendant holds itself out as an "interstate" motor carrier, advertises interstate services, is licensed with the United States Department of Transportation (USDOT), and holds all of the authorizations required of interstate motor carriers of passengers issued by the agency within the USDOT that regulates such carriers, the Federal Motor Carrier Safety Administration (FMCSA). (Def.'s SMF ¶¶ 3 & 5; Pls.' SMF ¶ 1.) Defendant holds operating authority from the FMCSA in the form of an interstate motor common carrier certificate, which gives Defendant authority "to engage in transportation as a common carrier of passengers in charter and special operations, by motor vehicle in interstate or foreign commerce." (Def.'s SMF ¶ 4.) Defendant has been issued a USDOT number by the FMCSA evidencing its right to engage in interstate commerce subject to the FMCSA's safety regulations. (Def.'s SMF ¶ 3.) Defendant requires that its drivers become qualified to drive all types of vehicles used by it for passenger transportation and Defendant maintains a "driver qualification file" for each driver as required by 49 C.F.R. § 391.51(a). (Def.'s SMF ¶ 6.) Defendant is required to comply with the Federal Motor Carrier Safety Regulations (FMCSR), including the hours of service regulations governing drivers of vehicles used in interstate commerce at 49 C.F.R. Part 395, and to maintain required USDOT records evidencing such compliance. (Def.'s SMF ¶ 3.) Logs and other records are maintained in accordance with the requirements of those rules.[2] (Def.'s SMF ¶ 6.) Defendant's drivers are subject to random drug alcohol testing required by the FMCSR. (Def.'s SMF ¶ 6.)

Defendant provides transportation service between Florida and other states, as well as single-state carriage of persons, including to and from the local seaports and airports, and to and from the seaports to local hotels. (Def.'s SMF ¶¶ 5 & 10; Pls.' SMF ¶ 21 n. 2.) Defendant does not keep records of the number of trips that it makes during a given time frame, i.e., on a daily, weekly, monthly, or yearly basis. (Brittenum Dep. 67 & 116, Dec. 20, 2007; Brittenum Dep. 41, Jan. 14, 2008.) Defendant has provided an estimate that on a given day it may have 100 buses on the road, and that annually it makes approximately 10,000 trips, including to and from airports and seaports, university shuttle routes, and charters. (Brittenum Dep. 67, Dec. 20, 2007; Brittenum Dep. 41, Jan. 14, 2008.)

From August 2004 through December 2007, Defendant made 148 trips across the State line, many of which lasted several weeks and some of which lasted between thirty-five and ninety days. (Def.'s SMF ¶ 7.) These trips across the State line produced over $1.7 million, or 4% of Defendant's total revenues for the period from August 2004 through December 2007.[3]

**2.** However, according to Plaintiffs, the logbooks are not an accurate reflection of the number of hours Plaintiffs actually worked. (Pls.' SMF in Support of their Resp. to Def.'s Mot. for Summ. J. (SMF II) ¶¶ 16–17, 23, 27, 30, 35.)

**3.** Plaintiffs wish to subtract from the total revenues derived from trips across the State line during the period from August 2004 through December 2007 the revenue derived from trips to Louisiana made in September and October 2005, and August and November 2006 for purposes of providing hurricane relief in Louisiana. Plaintiffs argue that these trips should not be included in calculating the total revenues derived from trips across the State line during the period from August 2004 through December 2007 because the trips were "anomalous," and because at least some of these trips involved driving across the State line with empty buses, and then either dropping off the buses for third parties to use in providing hurricane relief, or driving passengers within the State of Louisiana.

(Def.'s SMF ¶ 7; Pls.' SMF ¶ 12.) Seventy-four different drivers out of the 393 drivers employed by Defendant during the period from August 2004 through December 2007 (approximately 18%) made trips across the State line. (Def.'s SMF ¶ 7; Pls.' SMF ¶ 13.) Of those drivers eight have driven across the State line between five and fifteen times, and the remainder average one or two trips each across the State line. (Pls.' SMF ¶ 13.)

According to Defendant, of the sixty-three Plaintiffs in this action, eleven (approximately 17%) have driven across the State line while employed by Defendant, and have spent a total of 286 days on such trips across the State line. (Def.'s SMF ¶ 8; Kelly Decl. ¶ 9 & Ex. B.) Plaintiffs have provided evidence that at least two of the eleven Plaintiffs counted by Defendant never traveled out of the State while employed by Defendant, so the calculation would be adjusted, such that, of the sixty-three Plaintiffs in this action, nine (approximately 14%) have driven across the State line while employed by Defendant, and have spent fewer than 286 days on such trips across the State line. (Pls.' SMF II ¶¶ 6–7; Kelly Decl. ¶ 9 & Ex. B; Burns Aff. ¶¶ 2–3; Smith Aff. ¶¶ 2–3.) Of the twenty-three Plaintiffs who were employed by Defendant for one year or more during the period from August 2004 through December 2007, six Plaintiffs (26%) drove across the State line while employed by Defendant. (Kelly Decl. ¶ 9 & Exs. B & C; Burns Aff. ¶¶ 2–3.)

Of the Plaintiffs who have driven across the State line while employed by Defendant, there is evidence that four of these Plaintiffs drove empty buses across the State line and did not transport passengers on these trips (Zellner Aff. ¶ 3; Chambers Aff. ¶ 3; Pedrozo Aff. ¶ 3; Sheffield Aff. ¶ 3); two of these Plaintiffs either drove an empty bus across the State line or flew out-of-state, and then remained at their out-of-state destination to drive passengers within that State (Jefferson Aff. ¶ 3; Saunders Aff. ¶ 3); and one of these Plaintiff drivers took two trips across the State line while employed by Defendant, transporting passengers across the State line on one of those trips, and driving an empty bus across the State line on the other trip, remaining there for a few days to drive passengers within that State (Price Aff. ¶ 3).

Defendant was audited by the USDOT, FMSCA on October 18, 2004. (2d Supplemental Brittenum Decl. ¶ 2 & Ex. A.) Defendant also was audited in May 2007 by the FMSCA and the Florida Department

---

Plaintiffs have not, however, provided a legal basis for subtracting the revenues derived from the hurricane-related trips to Louisiana. Plaintiffs cite 49 U.S.C. § 13501, which provides in relevant part that the Secretary of Transportation has "jurisdiction [as specified in Part B of Subtitle IV of Title 49] over transportation by motor carrier and the procurement of that transportation, to the extent that passengers, property, or both are transported by motor carrier [ ] between a place in [ ] a State and a place in another State; [ ] a State and another place in the same State through another State; ... [or] the United States and a place in a foreign country to the extent the transportation is in the United States...." 49 U.S.C. § 13501.

As defined by 49 U.S.C. § 13102(14), the motor carrier is the "person providing commercial motor vehicle ... transportation for compensation." Where the motor carrier dispatches an empty bus from State A into State B in order to transport cargo or passengers between two points in State B, the transportation within State B constitutes interstate commerce. *See* Federal Motor Carrier Safety Administration, Interpretation for Part 390: General, § 390.3 General Applicability, Question 14, *available at* http://www.fmcsa.dot.gov/rules-regulations/administration/fmcsr/fmcsrruletext.asp?rule_toc=759&section=390.3&section_toc=1738.

of Transportation (FLDOT) to determine compliance with the FMSCR and State regulations.[4] (Def.'s SMF ¶ 3.) Defendant was cited by the FLDOT for violations of both federal and State regulations, including ninety-five violations regarding drivers' hours of service. (Pls.' SMF ¶ 39.) The violations were found in only a sampling of Defendant's drivers' logbooks. (Pls.' SMF ¶ 39.) During the course of the audit, Sergeant Michael Roberts of the FLDOT determined, based on information provided by Defendant including thousands of randomly sampled driver logbooks, that the majority of Defendant's trips were within the State, and that Defendant conducted a limited number of trips across the State line. (Pls.' SMF ¶¶ 40–42.) During the course of the May 2007 audit, Roberts learned that sixty-seven of Defendant's then-employed drivers did not make any trips across the State line while employed by Defendant, and out of thousands of logbook entries, there were a total of nine trips across the State line during the six-month period preceding the May 2007 audit. (Pls.' SMF ¶ 44.)

On September 1, 2006, Defendant entered into a written contract (the "Transportation Services Agreement") with Royal Carribean Cruise Lines (RCCL) to provide ground transportation services to RCCL cruise line passengers. (Def.'s SMF ¶ 17; Pls.' SMF ¶ 19.) According to Defendant, it began providing ground transportation services to RCCL cruise line passengers in April 2006, approximately five months prior to the September 1, 2006 effective date of the written contract. (Brittenum Decl. ¶ 18(a); Brittenum Supplemental Decl. ¶ 3 & Ex. A.) During the period from April 2006 to December 2007, Defendant has transported more than 500,000 RCCL cruise passengers, yielding revenues in excess of $4.4 million. (Brittenum Decl. ¶ 18(a).) However, according to Plaintiffs, RCCL did not use Defendant for ground transportation services until the Transportation Services Agreement became effective on September 1, 2006. (Trescastro Dep. 7:3–13; 45:1–4, Mar. 6, 2008.)

Defendant is the sole provider of airport-to-seaport and seaport-to-airport ground transportation services for RCCL's passengers during the day; another company provides RCCL's ground transportation services at night. (Brittenum Dep. 191:23–192:11, Jan. 14,2008; Trescastro Dep. 6:10–23.) Under the Transportation Services Agreement between Defendant and RCCL, Defendant provides airport-to-seaport and seaport-to-airport ground transportation for RCCL cruise line passengers to and from Miami and Fort Lauderdale airports to and from the Port of Miami and Port Everglades in Fort Lauderdale. (Pls.' SMF ¶ 21.) The distance between these airports and seaports does not exceed a twenty-five mile radius "as the crow flies," although the distance by road between these airports and seaports is longer than twenty-five miles. (Pls.' SMF ¶ 21; Def.'s Resp. to Pls.' SMF ¶ 21.) Defendant also provides ground transportation for RCCL cruise line passengers to and from the seaports to local hotels. (Pls.' SMF ¶ 21 n. 22.)

Under the Transportation Services Agreement between Defendant and RCCL, Defendant provides RCCL cruise line passengers ground transportation booked through travel agents or through packages sold by RCCL, which include airfare and ground transportation. (Pls.' SMF ¶ 22.) RCCL also sells hotel packages, which include ground transportation.

---

4. Florida has adopted federal safety regulations, including those that pertain to driver hours of service contained in 49 C.F.R. Part 395, for intrastate transportation within Florida. Fla. Stat. § 316.302.

(Trescastro Dep. 11:17–20.) Approximately 85% of RCCL's bookings are sold through travel agents, and the remaining 15% are sold directly through RCCL. (Pls.' SMF ¶ 22.) If an RCCL cruise line passenger has not pre-booked ground transportation from seaport to airport, passengers can purchase shuttle service vouchers before disembarking. (Pls.' SMF ¶ 23.) Likewise, if an RCCL cruise line passenger has not pre-booked ground transportation from airport to seaport, passengers can, upon arrival at the airport, request shuttle service from an RCCL representative, and the ground transportation will be charged to the passenger's RCCL customer account. (Pls.' SMF ¶ 23.) RCCL sends its cruise line passengers a booklet of "guest vacation documents" describing the cruise itinerary and providing a checklist, information on what to expect on the cruise, the availability of shore excursions, and other information, along with "vouchers" for hotel stays and ground transportation that the passenger has purchased. (Pls.' SMF ¶ 24.)

Under the Transportation Services Agreement, RCCL provides Defendant with weekly shuttle manifests indicating the date and time of the requested shuttle services, the number of passengers to be shuttled, and the flight and vessel information. (Pls.' SMF ¶ 26.) The manifests are provided to Defendant one week in advance of the requested transport. (Pls.' SMF ¶ 26.) When RCCL cruise line passengers arrive at the airport, they are greeted by RCCL representatives, who have a manifest indicating the names of the RCCL cruise line passengers to be transported by Defendant's drivers. (Pls.' SMF ¶ 27.) Once the RCCL representative has gathered all of the arriving RCCL cruise line passengers upon their arrival at the airport, the RCCL representative contacts Defendant and requests a bus, providing Defendant with the number of RCCL cruise line passengers and the terminal pick-ups. (Pls.' SMF ¶ 28.) Defendant and its drivers are not provided with the RCCL cruise line passenger manifests or with the identity of the passengers it transports. (Pls.' SMF ¶ 26.)

At the airport, RCCL representatives collect ground transportation vouchers from the cruise line passengers and discard the vouchers. (Pls.' SMF ¶ 29.) Defendant does not receive the ground transportation vouchers; instead, RCCL provides Defendant with a "load slip" with a passenger head count. (Pls.' SMF ¶ 29.) Based on the load slip head count, Defendant invoices RCCL at a specific rate for each RCCL cruise line passenger it transports to and from the airport to and from the seaport (Pls.' SMF ¶ 30.) Under their Transportation Services Agreement, RCCL may pay Defendant at either a per-passenger or a per-bus rate. (Pls.' SMF ¶ 30.) The price RCCL charges its guests for ground transportation is unrelated to the price RCCL pays Defendant for its services. (Pls.' SMF ¶ 31.) There is no price indicated on the RCCL cruise line passengers' ground transportation vouchers; RCCL cruise line passengers are charged a bundled rate, with no line item prices as to the cruise, air transportation, and ground transportation. (Pls.' SMF ¶ 31.) RCCL cruise line passengers' ground transportation vouchers are non-refundable if not used, but passengers may receive an on-board credit for shore excursions. (Pls.' SMF ¶ 32.)

If an RCCL cruise line passenger who has booked and paid for a cruise, air transportation and ground transportation cannot make his or her sailing date, Defendant does not receive any of the revenue RCCL collects from such a passenger; rather under their agreement, Defendant only receives payment from RCCL when Defendant actually transports a passenger,

despite the fact that the passenger has paid for ground transportation as part of his or her cruise package. (Pls.' SMF ¶ 32.) In February 2008, Defendant and RCCL amended their Transportation Services Agreement, providing that RCCL would guarantee Defendant a minimum number of passengers it would be transporting, and would pay Defendant at a rate of one-half of the per-passenger price for the number of passengers short of the guaranteed minimum. (Pls.' SMF ¶ 33.)

Under their Transportation Services Agreement, RCCL retained the right to terminate the agreement with one month's notice to Defendant if, in its "sole and absolute opinion" RCCL found Defendant's ground transportation services unsatisfactory. (Pls.' SMF ¶ 35.) Where an RCCL cruise line passenger books a cruise, air and ground transportation far in advance, there is no assurance that the passenger's transportation will be provided by Defendant, as there is no guarantee that the agreement between RCCL and Defendant will be in force at that time. (Pls.' SMF ¶ 35.)

During 2003, 2004, and 2006, Defendant also had arrangements with Costa Cruises and Princess Cruises to provide ground transportation services to Costa Cruises and Princess Cruises passengers who purchased such services. (Brittenum Decl. ¶¶ 18(b)-(c) & Exs. F-G.) No written agreement was entered between Defendant and Costa Cruises or between Defendant and Princess Cruises. (Brittenum Decl. ¶¶ 18(b)-(c).) According to Defendant, its revenues from the arrangement with Costa Cruises exceeded $500,000, and its revenues from the arrangement with Princess Cruises exceeded $200,000. (Brittenum Decl. ¶¶ 18(b)-(c).)

During 2006 and continuing through the present, Defendant also has had arrangements with several independent ground agents to provide ground transportation services to Costa Cruises passengers, Prince Cruise VIP groups, Cunard Cruises passengers, and Crystal Cruises passengers who purchase ground transportation services. (Brittenum Decl. ¶¶ 18(d)-(f) & Exs. H-J.) Defendant did not enter into written agreements with any of these independent ground agents. (Brittenum Decl. ¶¶ 18(d)-(f).) In addition, Defendant has arrangements with tour operators, travel agents, and other entities that charter buses, pursuant to which Defendant's drivers transport passengers to and from the local airports to and from local hotels or other destinations. (Kelly Decl. ¶ 12 & Ex. A.) There is no evidence in the record indicating that Defendant entered into a written agreement with any of these tour operators, travel agents, or other entities.

Generally, Defendant's drivers are assigned to jobs on a rotating basis, and Defendant calls on its drivers to do all different types of work. (Brittenum Dep. 63:1-4, Jan. 14, 2008.) However, Defendant also maintains a seniority list for all its drivers, and drivers with seniority usually get first pick as to the types of jobs they will be assigned. Where a driver with seniority prefers to stay local, he can choose to work a local route. (Pls.' SMF ¶¶ 15-16; Riley Dep. 19:7-10:7.) In an October 24, 2006 memorandum to all Defendant's drivers from Bret Brittenum, Defendant's Vice President and General Manager, Defendant explained its seniority policy as follows: "Seniority will be used for granting time-off, vacations, positioning of coaches at debark, some work and vehicle assignments, route assignments on fixed routes, and for other to be determined uses. Work is assigned on a rotation basis so that everyone has a chance to work." (Pls.' SMF, Ex. 15.)

Defendant's "Hiring Standards" form effective October 7, 2003, states that drivers

must "Be Able To Work Various Jobs, Hours And Shifts (Local & Out of Town)." (Pls.' SMF, Ex. 16.) Defendant's "Hiring Standards" form effective October 7, 2003, was revised sometime in 2006 and states that drivers must "Be able to work various jobs, hours, shifts (local & out of town) and be willing and able to drive interstate routes." (Brittenum Decl. ¶ 11 & Ex. C.) Each driver must sign Defendant's Hiring Standards form before they can perform any driving jobs for Defendant. (Brittenum Decl. ¶ 11.) If a driver refuses to perform an assignment without good cause, the refusal is grounds for automatic termination. (Brittenum Decl. ¶ 20; Arditi Decl. ¶ 4; Brittenum Dep. 63:13–16, Jan. 14, 2008; Arditi Dep. 76.) The affirmations of twenty-three of the Plaintiff drivers in this action demonstrate that it was common knowledge among the drivers that they would be fired for refusing a job assignment. (Pl.'s SMF in Resp. to Def.'s Mot. for Summ. J., Ex. 12.)

Defendant has approximately thirty-five to forty drivers who currently drive routes for shuttle services Defendant provides for the University of Miami. (Brittenum Dep. 10:5–11:13, Jan. 14, 2008.) It is not unusual for drivers driving the University shuttle routes to work more than sixty hours per week. (Brittenum Dep. 57–58, Jan. 14, 2008.) According to Defendant, it does not have drivers that exclusively drive University shuttle routes. (Brittenum Dep. 10:4–17, Jan. 14, 2008.) Rather, the bus drivers that drive shuttle routes for the University of Miami, Florida International University, and Barry University are considered a part of Defendant's "regular drivers pool." (Rivera Dep. 47:1–18.) However, according to Plaintiffs, based on the deposition testimony of Defendant's Assistant Director of Operations, Priscilla Rivera, Defendants have drivers that "mainly work" the University shuttle routes (the "University shuttle bus drivers"). (Rivera Dep.

34–35; 47–49; 54–55.) The University shuttle bus drivers may be asked to do general charter work, including trips across the State line or airport-to-seaport runs, but these drivers are not required to do such work. (Rivera Dep. 34–35; 47–49; 54–55; Harper Aff. ¶¶ 3–4.) For example, according to Dwayne Harper, the supervisor of Defendant's University of Miami shuttle bus drivers, typically towards the end of each week Harper receives a phone call "from someone from [Defendant's] main terminal, asking that [he] try to find a certain few [University of Miami] drivers who would be willing to drive on the upcoming weekend." (Harper Aff. ¶ 3.) Harper "then ask[s] around to see if anyone would like to work the weekend job(s) to earn some extra money." (Harper Aff. ¶ 3.) According to Harper, he "offer[s] these jobs to [his] drivers, [but he] do[es] not force them to work the weekend jobs and they are free to turn them down." (Harper Aff. ¶ 4.)

The majority of Plaintiffs in this action have, during the course of their employment by Defendant, driven passengers to and from local airports to and from local seaports, and to and from the seaports to and from local hotels. (Def.'s SMF ¶ 11.) Of the sixty-three Plaintiffs in mis case, forty-eight, (76%), have driven some type of airport or airport-seaport transfer during the period from August 2004 through December 2007. (Def.'s SMF ¶¶ 11 & 16.) Those Plaintiffs have received a total of more than 1,000 such assignments, each of which represents multiple trips to and from the airports and seaports. (Def.'s SMF ¶¶ 11 & 16.) The majority of the Plaintiffs who have not actually driven passengers to and from seaports and airports were employed by Defendant for a short period of time. (Def.'s SMF ¶ 11.)

## LEGAL STANDARD

Summary judgment is authorized only when the moving party meets its burden of

demonstrating that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56. When determining whether the moving party has met this burden, the court must view the evidence and all factual inferences in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Rojas v. Florida*, 285 F.3d 1339, 1341–42 (11th Cir.2002).

The party opposing the motion may not simply rest upon mere allegations or denials of the pleadings; after the moving party has met its burden of proving that no genuine issue of material fact exists, the non-moving party must make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir.1997); *Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir.1989). If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. *Envntl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir.1981).[5] Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply Co. v. Cont'l Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir. 1969). If reasonable minds might differ on the inferences arising from undisputed facts then the court should deny summary

judgment. *Impossible Elec. Techniques, Inc. v. Wackenhut Protective Sys., Inc.*, 669 F.2d 1026, 1031 (5th Cir.1982); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[T]he dispute about a material fact is 'genuine/. . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'").

Moreover, the party opposing a motion for summary judgment need not respond to it with evidence unless and until the movant has properly supported the motion with sufficient evidence. *Adickes*, 398 U.S. at 160, 90 S.Ct. 1598. The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever. *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 611–12 (5th Cir.1967). The Court must resolve all ambiguities and draw all justifiable inferences in favor of the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 255, 106 S.Ct. 2505.

### MOTOR CARRIER EXEMPTION

Under the FLSA, an employer must compensate employees for hours worked in excess of forty per week "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). Defendant argues that Plaintiffs are exempt under the motor carrier exemption, 29 U.S.C. § 213(b)(1), and therefore not entitled to overtime compensation. "The question of how [Plaintiffs spent their time working for Defendants] is a question of fact. The question whether their particular activities excluded them from the overtime benefits

---

5. Decisions of the United States Court of Appeals for the Fifth Circuit entered before October 1, 1981, are binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981).

of the FLSA is a question of law." *Icicle Seafoods, Inc. v. Worthington,* 475 U.S. 709, 714, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986); *see also Morrison v. Quality Transp. Servs., Inc.,* 474 F.Supp.2d 1303, 1308 (S.D.Fla.2007) (citing *Icicle Seafoods,* 475 U.S. at 714, 106 S.Ct. 1527). The employer has the burden of proving the applicability of the FLSA exemption. *Klinedinst v. Swift Inv., Inc.,* 260 F.3d 1251, 1254 (11th Cir.2001); *see also Morrison,* 474 F.Supp.2d at 1308 (citing *Klinedinst,* 260 F.3d at 1254). Exemptions to the FLSA "are to be narrowly construed against the employer who asserts them." *Jeffery v. Sarasota White Sox, Inc.,* 64 F.3d 590, 594 (11th Cir.1995); *Nicholson v. World Bus. Network, Inc.,* 105 F.3d 1361, 1364 (11th Cir.1997) (recognizing that the FLSA's exemptions must be narrowly construed, "giving due regard to the plain meaning of statutory language and the interest of Congress," and also recognizing that " '[t]o extend an exemption to other than those plainly and unmistakably *within its terms and spirit* is to abuse the interpretive process and to frustrate the announced will of the people' " (quoting *A.H. Phillips, Inc. v. Walling,* 324 U.S. 490, 493, 65 S.Ct. 807, 89 L.Ed. 1095 (1945))).

Under § 213(b)(1) of the FLSA, the provisions of § 207 "shall not apply with respect to [ ] any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." 29 U.S.C. § 213(b)(1). Section 31502(a)(1) limits the application of § 31502 to transportation "described in section[ ] 13501" of Title 49. 49 U.S.C. § 31502(a)(1). As relevant to this action, § 13501 of Title 49 gives the Secretary of Transportation jurisdiction over transportation by motor carriers to the extent that passengers, property, or both are transported by motor carrier between a place in a State and a place in another State; a State and another place in the same State through another State; or the United States and a place in a foreign country to the extent the transportation is in the United States. 49 U.S.C. § 13501.[6]

The applicable regulations explain that the "exemption of an employee from the hours provisions of the Fair Labor Standards Act ... depends both on the class to which his employer belongs and on the class of work involved in the employee's job." 29 C.F.R. § 782.2. More specifically, the Secretary of Transportation has the authority to establish maximum hours and qualifications of service for employees, and thereby trigger application of the motor carrier exemption, if two requirements are met: (1) an employee plaintiff must "be employed by carriers whose transportation

---

**6.** Section 13501 provides, in full, as follows: The Secretary and the Board have jurisdiction, [as specified in Part B of Subtitle IV of Title 49], over transportation by motor carrier and the procurement of that transportation, to the extent that passengers, property, or both, are transported by motor carrier—
(1) between a place in—
(A) a State and a place in another State;
(B) a State and another place in the same State through another State;
(C) the United States and a place in a territory or possession of the United States to the extent the transportation is in the United States;
(D) the United States and another place in the United States through a foreign country to the extent the transportation is in the United States; or
(E) the United States and a place in a foreign country to the extent the transportation is in the United States; and
(2) in a reservation under the exclusive jurisdiction of the United States or on a public highway.
49 U.S.C. § 13501.

of passengers is subject to the Secretary's jurisdiction" under the Motor Carrier Act; and (2) an employee plaintiff must "engage in activities of a character directly affecting the safety of operation of motor vehicles in interstate or foreign commerce within the meaning of the Motor Carrier Act." 29 C.F.R. § 782.2.

As the court in *Morrison* observed, "[t]he Department of Labor's jurisdiction under the FLSA and the Department of Transportation's jurisdiction under the Motor Carrier Act are mutually exclusive and there is no overlapping jurisdiction." *Morrison*, 474 F.Supp.2d at 1309 n. 2 (citing *Morris v. McComb*, 332 U.S. 422, 437–38, 68 S.Ct. 131, 92 L.Ed. 44 (1947)). "In order to avoid any conflicts between these Acts, Congress decided that the Secretary of Transportation need not actually exercise his or her power to regulate under the Motor Carrier Act and that the FLSA's § 213(b)(1) exemption applies so long as the Secretary has the authority to regulate over a particular category of employees." *Id.* (citing *Spires v. Ben Hill County*, 980 F.2d 683, 686 (11th Cir.1993)).

### A. Whether Defendant Is A Carrier Whose Transportation of Passengers is Subject to the Secretary's Jurisdiction Under the Motor Carrier Act

■ First, the Court must determine whether, as a matter of law, Defendant is a carrier whose transportation of passengers is subject to the Secretary's jurisdiction under the Motor Carrier Act, or whether there are genuine issues of material fact that preclude such a determination by the Court at this stage in the litigation.

In *Baez v. Wells Fargo Armored Service Corp.*, the Eleventh Circuit found that the defendant, which held a permit from the Interstate Commerce Commission (ICC), was a "contract carrier," and as such, subject to the Secretary's jurisdiction under the Motor Carrier Act. 938 F.2d 180, 182 (11th Cir.1991) (citations omitted), *cert. denied*, 502 U.S. 1060, 112 S.Ct. 941, 117 L.Ed.2d 111 (1992). In making this finding, the *Baez* court stated: "In fact, the permit issued by the ICC indicates that jurisdiction has already been exercised." [7] *Id.* (citing *Brennan v. Schwerman Trucking Co. of Virginia, Inc.*, 540 F.2d 1200 (4th Cir.1976)). Therefore, the *Baez* court concluded, "it [was] clear that [the defendant] [was] a motor carrier subject to the Secretary's jurisdiction." *Id.; see also Morrison v. Quality Transports Services, Inc.*, 474 F.Supp.2d 1303, 1309 (S.D.Fla. 2007) (finding that the defendant demonstrated that it was a motor carrier whose transportation of property or passengers was subject to the Secretary's jurisdiction under the Motor Carrier Act based on evidence that (1) the defendant held a USDOT license; (2) the defendant operated vehicles whose weight or passenger capacity fell within the authority of the FMSCA; and (3) the defendant was subject to regulation by the FMSCA including regular inspections by the USDOT).

Relying on *Baez* and *Morrison*, Defendant argues that, based on the following undisputed evidence in the record, it has met its burden of establishing that it is a carrier whose transportation of passengers is subject to the Secretary's jurisdiction under the Motor Carrier Act: (1) Defendant is licensed by the USDOT, and holds all of the authorizations required of interstate motor carriers of passengers issued by the FMCSA; (2) Defendant has been

---

7. In 1995, Congress passed the ICC Termination Act, which transferred motor carrier operating authority responsibilities to the Department of Transportation (DOT). Pub.L. No. 104–88, §§ 103–104, 109 Stat. 803 (1995) (codified as amended at 49 U.S.C. § 13501 (2000)).

issued a USDOT number by the FMSCA evidencing its right to engage in interstate commerce subject to the FMSCA's safety regulations; (3) Defendant makes extensive efforts to comply with federal requirements for interstate drivers; (4) Defendant's drivers are required to become qualified to drive all types of vehicles used by Defendant for passenger transportation and Defendant maintains a "driver qualification file" for each driver as required by 49 C.F.R. § 391.51(a); (5) Defendant is required to comply with the FMCSR, including hours of service regulations governing drivers of vehicles used in interstate commerce at 49 C.F.R. Part 395 and to maintain required USDOT records evidencing such compliance; (6) Defendant's drivers are subject to random drug alcohol testing required by the FMSCR; and (7) Defendant has been audited by the US-DOT. Applying *Baez* and *Morrison,* the Court finds that the undisputed evidence in the record is sufficient to establish that Defendant is a motor carrier whose transportation of property or passengers is subject to the Secretary's jurisdiction under the Motor Carrier Act.[8]

The Court also notes that Defendant undisputably holds itself out as an interstate motor carrier and advertises interstate services. *See Chao v. First Class Coach Co.,* 214 F.Supp.2d 1263, 1271 (M.D.Fla.2001) ("Merely holding itself out as an interstate commerce carrier, which [the defendant] unquestionably did, may have been enough to determine its status as an interstate motor carrier.") (citing *Brennan,* 540 F.2d at 1204); *see also Rossi v. Associated Limousine Servs., Inc.,* 438 F.Supp.2d 1354, 1361 (S.D.Fla.2006) ("[D]ecisions under the FLSA hold that the Secretary of Transportation has the power to set maximum hours for drivers if the company engages in more than *de minimi* interstate commerce which includes a company that holds itself out as a interstate company and solicits that business even though its prospect of obtaining such business is poor and some of its drivers never drive in interstate commerce." (citing *Reich v. Am. Driver Serv., Inc.,* 33 F.3d 1153 (9th Cir.1994); *Morris v. McComb,* 332 U.S. 422, 68 S.Ct. 131, 92 L.Ed. 44 (1947))).

In reaching its determination that Defendant has met its burden of establishing that it is a motor carrier whose transportation of property or passengers is subject to the Secretary's jurisdiction under the Motor Carrier Act, the Court has considered Plaintiffs' arguments that despite the foregoing evidence in the record, Defendant has not met—or cannot meet—its burden

---

**8.** Plaintiffs admit that "all of the indicia of an 'interstate carrier' are present." However, Plaintiffs cite *Cartun v. Carey International, Inc.,* No. 0421074–CIV–UNGARO–BENAGES, 2004 U.S. Dist. LEXIS 30346, at *26 (S.D.Fla. Dec. 9, 2004), in which this Court rejected the plaintiffs argument that the defendants could not rely on the motor carrier exemption as a result of the defendants' failure to adhere to the requirements imposed on motor carriers under the Motor Carrier Act. In *Cartun,* this Court observed that the motor carrier exemption turns "only on the jurisdiction conferred on the Secretary of Transportation under the Motor Carrier Act; application of the exemption does not ... depend also on the employer's conformance with the require-

ments of the Motor Carrier Act." *Id.* (citing *Bilyou v. Dutchess Beer Distributors, Inc.,* 300 F.3d 217, 229 (2d Cir.2002)). *Cartun* is not inconsistent with this Court's finding that Defendant has met its burden of establishing that it is a carrier whose transportation of passengers is subject to the Secretary's jurisdiction under the Motor Carrier Act based on the undisputed evidence in the record. *See also Packard v. Pittsburgh Transp. Co.,* 418 F.3d 246 (3d Cir.2005), *cert. denied,* 547 U.S. 1093, 126 S.Ct. 1786, 164 L.Ed.2d 557 (2006) ("[T]he MCA exemption depends only on the existence of secretarial authority, not on its exercise."); *Morrison,* 474 F.Supp.2d at 1309 n. 2 (same) (citing *Spires,* 980 F.2d 683, 686 (11th Cir.1993)).

because, according to Plaintiffs, the "true test" to determine whether Defendant is within the Secretary's jurisdiction for purposes of the motor carrier exemption is whether Defendant engages in more than *de minimus* interstate operations, and, based on the percentage of trips Defendant made across the State line out of the total number of trips it made during the period from August 2004 through December 2007, Plaintiffs argue that Defendant cannot show that it engages in more than *de minimus* interstate operations. However, for the following reasons, the Court finds Plaintiffs' arguments unavailing.

Plaintiffs rely on *Mason v. Quality Transport Services, Inc.*, No. 04–61009–CIV–ALTONAGA/Turnoff, 2005 WL 5395338, at *1 (S.D.Fla. Aug.29, 2005). However *Mason* actually supports a finding that Defendant is a carrier whose transportation of passengers is subject to the Secretary's jurisdiction under the Motor Carrier Act. In *Mason*, (1) the defendant was a corporation that provided bus service locally and nationwide, including long and short distance charter service, shuttle service, and transfer service; (2) interstate service was a significant component of the defendant's gross sales; and (3) the defendant had a certificate from the ICC authorizing it to operate in interstate and foreign commerce as a motor vehicle common motor carrier. *Id.* at *1. The *Mason* court observed that the "Secretary's power to set maximum hours for drivers is contingent upon the company engaging in more than *de minimus* inter-

state commerce," but that "[e]ven then, the Secretary does not have automatic jurisdiction over all drivers of an interstate carrier," and that jurisdiction "extends only to drivers who reasonably could be expected to make one of the carrier's interstate runs, and that means more than a remote possibility." *Id.* at *2. The *Mason* court denied summary judgment, finding that the evidence in the record "plainly introduced genuine issues of material fact concerning [the second prong of the test for determining the applicability of the motor carrier exemption,] whether [the plaintiff] could reasonably be expected to drive one of [the defendant's] interstate routes." [9] *Id.* at *3.

Applying *Mason*, the Court can easily conclude that Defendant has met its burden of establishing that it is a carrier whose transportation of passengers is subject to the Secretary's jurisdiction under the Motor Carrier Act based on the following undisputed evidence in the record: (1) Defendant is a corporation that provides bus service locally and nationwide, including long and short distance charter service, shuttle service, and transfer service; (2) Defendant is licensed by the USDOT, and holds all of the authorizations required of interstate motor carriers of passengers issued by the FMCSA; and (3) Defendant's trips across the State line during the period from August 2004 through December 2007 were a significant component of Defendant's business in that they produced over $1.7 million, or 4% of Defen-

---

9. Apparently the first prong of the test for determining the applicability of the motor carrier exemption—*i.e.* that the defendant must be a motor carrier whose transportation of property or passengers is subject to the Secretary's jurisdiction under the Motor Carrier Act—was satisfied by evidence that (1) the defendant was a corporation that provided bus service locally and nationwide, including long and short distance charter service, shuttle service, and transfer service; (2) interstate service was a significant component of the defendant's gross sales; and (3) the defendant had a certificate for the ICC authorizing it to operate in interstate and foreign commerce as a motor vehicle common motor carrier.

dant's total revenues for that time period.[10]

Plaintiffs also rely on *Morris v. McComb*, 332 U.S. 422, 68 S.Ct. 131, 92 L.Ed. 44 (1947), in which the Court considered the percentage of "total trips" in determining that the defendant was a carrier whose transportation of passengers is subject to the Secretary's jurisdiction under the Motor Carrier Act, and on *Garcia v. Fleetwood Limousine*, 511 F.Supp.2d 1233 (M.D.Fla.2007), in which the court considered "the employer's overall business, including the number of interstate trips made and the percentage of revenue from interstate trips," and "whether the carrier holds itself out to the public as providing interstate transportation through advertising, marketing, or otherwise" as "relevant factors" in the determination of whether the defendant is a carrier whose transportation of passengers is subject to the Secretary's jurisdiction under the Motor Carrier Act. *See also Lieberman v. Corporate Connection Lines, Inc.*, No. 03–CIV–22814, 2005 WL 5501491, at *1–2 (S.D.Fla. Apr.21, 2005) ("A carrier's involvement in interstate commerce must be established by some concrete evidence such as an actual trip in interstate commerce or proof that interstate business was solicited.... Furthermore, the [d]efendant's involvement in interstate commerce must be real and actual, not merely hypothetical or conjectural. If the employer or employee's involvement In [sic] interstate commerce could be characterized as de minimus, they may not be subject to the Secretary of Transportation's jurisdiction at all, and thus are not covered by the Motor Carrier Act."); *Rossi*, 438 F.Supp.2d at 1361–62 (finding that the defendant failed to meet its burden of establishing that it was engaged in interstate commerce for purposes of the motor carrier exemption where the defendant did not present any evidence showing an actual trip in interstate commerce or proof that interstate business was solicited). None of the decisions upon which Plaintiffs rely militate against a finding by the Court that Defendant has met its burden of establishing that it is a carrier whose transportation of passengers is subject to the Secretary's jurisdiction under the Motor Carrier Act based on the undisputed evidence in

---

**10.** As the Court has already addressed, *supra* note 3, Plaintiffs wish to subtract from the total revenues derived from trips across the State line during the period from August 2004 through December 2007 the revenue derived from trips to Louisiana made in September and October 2005, and August and November 2006 for purposes of providing hurricane relief in Louisiana. Plaintiffs argue that these trips should not be included in calculating the total revenues derived from trips across the State line during the period from August 2004 through December 2007 because the trips were "anomalous," and because at least some of these trips involved driving across the State line with an empty bus, and then driving passengers within the State of Louisiana.

As the Court found in note 3, *supra*, Plaintiffs have not provided a legal basis for subtracting such revenues. However, even assuming that the revenue derived from these hurricane-related Louisiana trips should be subtracted from the revenues derived from Defendant's trips across the State line during the period from August 2004 through December 2007, the Court still finds—based on the undisputed evidence that Defendant holds itself out as an interstate carrier, is licensed by the USDOT and has the right to engage in interstate commerce subject to the FMSCA's safety regulations—that Defendant has met its burden of establishing that it is a carrier whose transportation of passengers is subject to the Secretary's jurisdiction under the Motor Carrier Act.

In other words, assuming that Plaintiffs have created an issue of fact as to the revenues produced by Defendant's trips across the State line during the period from August 2004 through December 2007, it is not material to the issue of whether Defendant is a carrier whose transportation of passengers is subject to the Secretary's jurisdiction under the Motor Carrier Act.

the record.[11]

B. *Whether Plaintiffs Engaged in Activities of a Character Directly Affecting the Safety of Operation of Motor Vehicles in Interstate or Foreign Commerce Within the Meaning of the Motor Carrier Act*

Having determined that Defendant is a carrier whose transportation of passengers is subject to the Secretary's jurisdiction under the Motor Carrier Act, the Court must next determine whether as a matter of law Plaintiffs engage in or have engaged in activities of a character directly affecting the safety of operation of motor vehicles in interstate or foreign commerce within the meaning of the Motor Carrier Act, or whether there are genuine issues of material fact that preclude such a determination by the Court at this stage in the litigation. It is not disputed that Plaintiffs engaged in activities of a character directly affecting the safety of operation of motor vehicles; thus, the issue before the Court is whether Plaintiffs were engaged in interstate or foreign commerce within the meaning of the Motor Carrier Act.[12]

Defendant argues that it has met its burden of establishing that Plaintiffs engaged in interstate or foreign commerce within the meaning of the Motor Carrier Act in two ways: (1) by presenting evidence that all of its drivers could reasonably be expected to drive routes within the State that may be considered movement in interstate commerce within the meaning of the Motor Carrier Act because they are part of a "practical continuity of movement" across State lines from the point of origin to the point of destination; and (2) by presenting evidence that it regularly makes trips across the State line and that each of its drivers could reasonably be expected to make such trips.

For the reasons that follow, the Court finds that—with the exception of its University shuttle bus drivers—Defendant has met its burden of establishing that all of its drivers could reasonably be expected to drive routes within the State that are movement in interstate commerce within the meaning of the Motor Carrier Act. It is therefore unnecessary for the Court to make a determination as to whether all of Defendant's drivers could reasonably be expected to make trips across the State line. As to Defendant's University shuttle bus drivers, there are genuine issues of material fact concerning whether these drivers could reasonably be expected to make trips out of State or to drive routes within the State that are movement in

---

11. The Court also notes that the FLDOT's determinations during the May 2007 audit—in particular its determinations, based on information provided by Defendant including thousands of randomly sampled driver logbooks, that the majority of Defendant's trips were within the State; that Defendant conducted a limited number of trips across the State line; that sixty-seven of Defendant's then-employed drivers did not make any trips across the State line while employed by Defendant; and that out of thousands of logbook entries, there was a total of nine trips across the State line—do not create a genuine issue of material fact as to whether Defendant is a carrier whose transportation of passengers is subject to the Secretary's jurisdiction under

the Motor Carrier Act, because the Court's determination is based on its finding that Defendant has met its burden by establishing that it holds itself out as a interstate company and solicits that business, and that it is licensed by the USDOT and has the right to engage in interstate commerce subject to the FMSCA's safety regulations.

12. The applicable regulations explain that "[t]he work of an employee who is a full-duty or partial duty 'driver,' ... directly affects 'safety and operation' ... whenever he drives a motor vehicle in interstate or foreign commerce within the meaning of [the Motor Carrier Act]." 29 C.F.R. § 782.3(b).

interstate commerce within the meaning of the Motor Carrier Act.

Defendant argues that Plaintiffs are exempt under the motor carrier exemption because (1) Defendant's transportation of passengers to and from the local airports to and from the local seaports pursuant to contractual arrangements with one or more cruise lines and independent ground agents is movement in interstate commerce within the meaning of the Motor Carrier Act because it is part of a "practical continuity of movement" across State lines from the point of origin to the point of destination; and (2) all of Defendant's drivers could reasonably be expected to drive passengers on airport-to-seaport and seaport-to-airport runs pursuant to these arrangements during the relevant time period.

1. *Defendant's Seaport–to–Airport and Airport–to–Seaport Routes Are Movement in Interstate Commerce Within the Meaning of the Motor Carrier Act*

■ Plaintiffs argue that Defendant's transportation of passengers to and from the local airports to and from the local seaports pursuant to contractual arrangements with one or more cruise lines and independent ground agents is not movement in interstate commerce within the meaning of the Motor Carrier Act. The applicable regulations explain that "[w]hat constitutes ... transportation in interstate or foreign commerce, sufficient to bring ... an employee within the regulatory power of the Secretary of Transportation ..., is determined by definitions contained in the Motor Carrier Act itself," but that "[t]hese definitions are ... not identical with the definitions in the Fair Labor

Standards Act which determine whether an employee is within the general coverage of the wage and hours provisions as an employee 'engaged in (interstate or foreign) commerce'" 29 C.F.R. § 782.7(a). Thus, while "transportation within a single State is in interstate commerce within the meaning of the Fair Labor Standards Act where it forms a part of a 'practical continuity of movement' across State lines from the point of origin to the point of destination .... such transportation may or may not be considered also a movement in interstate commerce within the meaning of the Motor Carrier Act." 29 C.F.R. § 782.7(b)(1) (citing *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (1943)). The regulations explain that although "[d]ecisions of the Interstate Commerce Commission prior to 1966 seemingly have limited the scope of the Motor Carrier Act more narrowly than the courts have construed the Fair Labor Standards Act It is deemed necessary, [ ]as an enforcement policy only ... to assume that such a movement in interstate commerce under the Fair Labor Standards Act is also a movement in interstate commerce under the Motor Carrier Act, except in those situations where the Commission has held or the Secretary of Transportation or the courts hold otherwise." 29 C.F.R. § 782.7(b)(1). "[W]here ... it has been authoritatively held that transportation of a particular character within a single State is not in interstate commerce as defined in the Motor Carrier Act ..., there is no basis for an exemption under section 13(b)(1), even though the facts may establish a 'practical continuity of movement' from out-of-State sources." [13] 29 C.F.R. § 782.7(b)(1).

---

**13.** Plaintiffs urge the Court to follow the concurring opinion in *Packard v. Pittsburgh Transportation Co.*, 418 F.3d 246, 259 (3d

Cir.2005), which would not look for guidance to applicable regulations and case law to determine whether a motor carrier providing

Based on a prior decision of this Court, *Cartun v. Carey International, Inc.*, No. 0421074–CIV–UNGARO–BENAGES, 2004 U.S. Dist. LEXIS 30346 (S.D.Fla. Dec. 9, 2004), Plaintiff argues that Defendant cannot bring its drivers under the motor carrier exemption because it cannot demonstrate that it has a valid through ticketing or common arrangement with an air carrier. However, in *Cartun*, this Court found that the defendant, an intrastate limousine service providing transportation between the local airport and seaport had failed to establish that it was within the Secretary's jurisdiction (and outside the jurisdiction of the Department of Labor) where it had failed to produce evidence of a through ticketing or common arrangement with an air carrier. Likewise, in *In re Kimball*, 131 M.C.C. 908 (1980), on which Plaintiff also relies, the issue was the Secretary's jurisdiction over the petitioner's entirely local bus service. In contrast, in this case Defendant has clearly demonstrated that it is engaged in interstate commerce and therefore subject to the jurisdiction of the Secretary of the USDOT. Thus, in this case the relevant question is different from that presented in *Cartun* and *Kimball*; it is not whether Defendant is subject to the USDOT's jurisdiction, but whether Plain-

tiffs are engaged in interstate commerce and, as a result, within the motor carrier exemption.[14]

In contrast to the scenario before the Court in *Cartun*, there does not appear to be an ICC or STB decision in which it has been authoritatively held that where a carrier subject to the jurisdiction of the Secretary of the USDOT provides ground transportation between local airports and seaports for passengers, immediately prior to and subsequent to the passengers' interstate flights and international cruise voyages, such movement is not within interstate commerce as defined in the Motor Carrier Act. Therefore, if such movement is in interstate commerce under the FLSA, the Court must assume that such movement is also in interstate commerce under the Motor Carrier Act. 29 C.F.R. § 782.7(b)(1) ("Under this enforcement policy it will ordinarily be assumed by the Administrator that the interstate commerce requirements of the section 13(b)(1) exemption are satisfied where it appears that a motor carrier employee is engaged as a driver ... in transportation by motor vehicle which, although confined to a single State, is a part of an interstate movement of the goods or persons being thus transported so as to constitute interstate com-

---

wholly intrastate passenger transportation service may be engaged in "interstate commerce" within the meaning of the Motor Carrier Act where the intrastate passenger transportation service is within the "practical continuity of movement" in interstate travel. Rather, the concurring opinion in *Packard* would "hold the plain language of the Act's jurisdictional statute to be dispositive," insofar as the motor carrier exemption applies only where a motor carrier provides transportation across State lines. *Id.* The Court declines to follow the concurring opinion in *Packard* and depart from the majority view among Courts of Appeal that have "explored the scope of the Motor Carrier Act exemption via inquiry into the presence or absence of interstate commerce." *Id.* at 260 n. 11 (citing *Bilyou v. Dutchess Beer Distrib., Inc.*, 300

F.3d 217, 223 (2d Cir.2002); *Klitzke v. Steiner Corp.*, 110 F.3d 1465, 1470 (9th Cir.1997); *Foxworthy v. Hiland Dairy Co.*, 997 F.2d 670, 672 (10th Cir.1993); *Beggs v. Kroger Co.*, 167 F.2d 700, 702–03 (8th Cir.1948)).

14. This Court found in *Cartun* that two decisions of the ICC or STB—*Kimball* and *Motor Transportation of Passengers Incidental to Air*, 95 M.C.C. 526 (1964)—were "decisive" as to the issue before it, *i.e.* whether the defendant, an entirely local intrastate limousine service providing transportation between the local airport and seaport, was within the Secretary's jurisdiction (and outside the jurisdiction of the Department of Labor). *Cartun*, 2004 U.S. Dist. LEXIS 30346, at *18.

merce within the meaning of the Fair Labor Standards Act. This policy does not extend to drivers ... whose transportation activities are 'in commerce'... within the meaning of the act but are not a part of an interstate movement of the goods or persons carried") (citing *Wirtz v. Crystal Lake Crushed Stone Co.,* 327 F.2d 455 (7th Cir.1964)).[15] 29 C.F.R. § 782.7(b)(1).

In determining whether an employee is engaged in interstate commerce within the meaning of the FLSA, the courts have been "guided by practical considerations." *Marshall v. Victoria Transp. Co.,* 603 F.2d 1122, 1123 (5th Cir.1979) (quoting *Overstreet v. North Shore Corp.,* 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656, (1943) (quoting *Walling v. Jacksonville Paper Co.,* 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (1943))).[16] In making this determination, the courts looks to see if an employee's work "is actually in commerce or is so closely related to the movement of commerce that it is for practical purposes a part of it rather than an isolated local activity." *Id.* (citing *Mitchell v. C.W. Vollmer & Co.,* 349 U.S. 427, 75 S.Ct. 860, 99 L.Ed. 1196 (1955)).

In *Marshall,* the Fifth Circuit considered the issue of whether two city bus operators' employee drivers were transporting passengers "in commerce" within the meaning of the FLSA where the drivers were engaged in the transportation of persons traveling between Texas and Mexico. *Id.* The *Marshall* court observed that reliance on *United States v. Yellow Cab Co.,* 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947) was problematic because *Yellow Cab* "is an anti-trust suit in which the broader [FLSA] coverage precedents are not applicable," and because the taxi service at issue in *Yellow Cab* was found to be "only casual and incidental" to its passengers' travel to and from a railroad terminal, whereas in *Marshall,* "every bus route ... carrie[d] a substantial percentage of international travelers every day."[17] *Id.*

---

**15.** To illustrate, *Wirtz v. Crystal Lake Crushed Stone Co.,* 327 F.2d 455, 456 (7th Cir.1964) involved a suit for violation of the FLSA's overtime provisions brought against a trucking service by its employee drivers engaged in the handling and transportation of sand and gravel. The transportation services at issue involved the transportation of sand, gravel and chips from the manufacturing plant to a concrete mixing plant. *Id.* at 457. Additionally, the employee drivers transported materials in connection with construction and reconstruction of streets, roads and highways to job sites and also spread gravel on road surfaces and performed other types of general hauling and excavating work. *Id.* at 458–59. The *Wirtz* court found that the employee drivers' transportation services were in commerce within the meaning of the FLSA because they involved construction and maintenance of instrumentalities of interstate commerce, *i.e.,* public streets, roads, and highways. *Id.* at 457 & 458–59. Although these transportation activities were "in commerce" within the meaning of the FLSA, they were not a part of an interstate movement of the goods carried. *See* 29 C.F.R. § 782.7(b)(1).

**16.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**17.** In *Yellow Cab,* the Supreme Court, in the context of interpreting the applicability of the Sherman Act, considered whether a local taxicab company's transportation of persons embarking on or arriving from interstate rail journeys was transportation in interstate commerce. *Yellow Cab,* 332 U.S. at 230, 67 S.Ct. 1560. The Court observed that "interstate commerce is an intensely practical concept drawn from the normal and accepted course of business," and that "interstate journeys are to be measured by 'the commonly accepted sense of the transportation concept.'" *Id.* at 231, 67 S.Ct. 1560. (citations omitted). The Court also noted that "what may fairly said to be the limits of an interstate shipment of goods and chattels may not necessarily be the commonly accepted limits of an individual's interstate journey," and that "the beginning and end of a particular kind of interstate

at 1124. Instead, the Fifth Circuit found that the "correct rule" in the situation presented in *Marshall* derived from *United States v. Capital Transit Co.*, 338 U.S. 286, 70 S.Ct. 115, 94 L.Ed. 93 (1949), in which the Court held that a transit company's provision of transportation wholly within the District of Columbia for passengers bound to and from nearby Virginia establishments was part of a continuous stream of interstate transportation. *Marshall*, 603 F.2d at 1125 (quoting *Capital Transit Co.*, 338 U.S. at 290, 70 S.Ct. 115 (explaining that *Yellow Cab* did not conflict with its holding)).

In *Marshall*, the defendant bus operators "maintained downtown terminals a short distance from the International Bridge that crosses the Rio Grande," and operated regular fare paying routes within the city of Brownsville, Texas. *Id.* at 1124. In addition, "[u]nder contractual arrangements with merchants and shopping center operators, each defendant also operate[d] a route providing free bus service to the vicinity of [a nearby] shopping center." *Id.* All the intrastate routes were within walking distance of the bridge connecting Texas to Mexico, and between fourteen and eighteen "percent of all fare paying passengers on [the defendants'] buses either originate[d] or terminate[d] their journeys in Mexico." Based on this evidence, the *Marshall* court found that "although [the] defendants' employees [did]

not cross into Mexico, a substantial, regular and recurring part of their work consist[ed] of transporting persons that [were] making international journeys." *Id.* "Because their work was entwined with a continuous stream of international travel, they were engaged in commerce within the meaning of the [FLSA]." *Id.* at 1125.

Applying the *Capital Transit* rule followed by the Fifth Circuit in *Marshall*, the evidence in the record clearly demonstrates that the transportation of passengers on the airport-to-seaport and seaport-to-airport routes by Defendant's employee drivers is in interstate commerce within the meaning of the FLSA. As to Defendant's agreement with RCCL, Defendant has provided the Court with a copy of the Transportation Services Agreement entered into by Defendant and RCCL, pursuant to which Defendant provides ground transportation services between the South Florida seaports and airports to RCCL's cruise passengers who purchase such services through travel agents or directly through RCCL. Under the Transportation Services Agreement between Defendant and RCCL, Defendant provides motor transportation of passengers between seaports and airports either immediately prior or immediately subsequent to the passengers' international cruise voyages from or to the seaport, and immediately prior or immediately subsequent to the passengers' air travel.

commerce [must accordingly be marked] by its own practical considerations." *Id.*

The *Yellow Cab* Court went on to find that "the common understanding is that a traveler intending to make an interstate rail journey begins his interstate movement when he boards the train at the station and that his journey ends when he disembarks at the station in the city of destination." *Id*, "What happens prior to or subsequent to that rail journey, at least in the absence of some special arrangement, is not a constituent part of the interstate movement," because the "trav-

eler has complete freedom to arrive at or leave the station by taxicab, trolley, bus, subway, elevated train, private automobile, his own two legs, or various other means of conveyance." *Id.* at 232. The Court observed that the taxicab service is "contracted for independently of the railroad journey and may be utilized whenever the traveler so desires." *Id.* "From the standpoints of time and continuity, the taxicab trip may be quite distinct and separate from the interstate journey," and "[t]o the taxicab driver, it is just another local fair." *Id.*

As to Defendant's arrangements with Costa Cruises and Princess Cruises, and with independent ground agents, tour operators, travel agents, and other entities that charter buses, no written agreements have been supplied as evidence. However, Defendant has provided the undisputed testimony of Vice President and General Manager Brett Brittenum that Defendant's drivers regularly have transported and continue to transport passengers between South Florida airports and seaports under various oral "contracts or other arrangements that [Defendant] has with numerous cruise lines or their ground agents," and that pursuant to these agreements: (1) the cruise lines' passengers "purchased a pre-arranged single ticket or package of tickets from a cruise line or ground agent that includes airfare, ground transportation, in some cases a hotel, and an international cruise"; (2) Defendant's drivers "transport these passengers, the vast majority of whom have traveled from out of state, in buses, from local airports ... to local hotels, and then to local seaports ... or directly from the airports to the seaports"; (3) "[w]hen the passengers return from their cruises, [Defendant's] drivers transport them back to a hotel, and then to the airport, or directly to the airport"; the "charges for this transportation are pre-fixed, i.e., they are set by the ... arrangement between [Defendant] and the cruise lines or their agents"; and (4) "the vehicle is exclusively dedicated to use by cruise passengers on these trips and the itinerary is specified in advance." (Brittenum Decl. ¶ 18.) Defendant has presented no specific evidence regarding the terms of its arrangements with Princess Cruises and Costa Cruises, or with independent ground agents, tour operators, travel agents, and other entities that charter buses, but Defendant has provided evidence of its cash receipts and revenues derived from its transportation of Princess Cruises and Costa Cruises passengers, as well as Prince Cruise VIP passengers, Cunard Cruise passengers, and Crystal Cruise passengers. (Brittenum Decl. ¶ 18 & Exs. H–J.)

Thus, as in *Marshall,* the Court finds that although Defendant's drivers do not cross the State line while driving the airport-to-seaport and seaport-to-airport routes, a substantial, regular and recurring part of their work in driving such routes consists of transporting persons that are making interstate and international trips. Likewise, as in *Marshall,* because their work is entwined with a continuous stream of interstate and international travel, the Court finds that Defendant's drivers transporting passengers on the airport-to-seaport and seaport-to-airport routes are engaged in commerce within the meaning of the FLSA. *See Marshall,* 603 F.2d at 1125. Therefore, the Court must assume that such movement is also in interstate commerce under the Motor Carrier Act. 29 C.F.R. § 782.7(b)(1).

2. *With the Exception of Defendant's University Shuttle Bust Drivers, There Are No Genuine Issues of Material Fact Concerning Whether All of Defendant's Drivers Could Reasonably Be Expected to Drive Passengers on Airport–to–Seaport and Seaport–to–Airport Runs Purine the Relevant Time Period*

Having determined that Defendant's transportation of passengers to and from the local airports to and from the local seaports pursuant to contractual arrangements with one or more cruise lines and independent ground agents is movement in interstate commerce within the meaning of the Motor Carrier Act, the Court next addresses Defendant's argument that all Plaintiffs are exempt from the FLSA's overtime wage requirements because all of

Defendant's drivers could reasonably be expected to drive passengers on airport-to-seaport and seaport-to-airport runs pursuant these arrangements during the relevant time period.

"[E]ven a minor involvement in interstate commerce as a regular part of an employee's duties can subject that employee to the Secretary of Transportation's jurisdiction." *Reich,* 33 F.3d at 1155 (citations omitted). However, "an employee's minor involvement in interstate commerce does not necessarily subject that employee to the Secretary of Transportation's jurisdiction for an unlimited period of time." *Id.* (citations omitted). Moreover, "if the employee's minor involvement can be characterized as de minimus, that employee may not be subject to the Secretary of Transportation's jurisdiction at all." *Id.* at 1156 (citations omitted).

On the other hand, Plaintiffs may be subject to the motor carrier's exemption, and therefore exempt from the FLSA's maximum hours and overtime requirements if the carrier has engaged in interstate commerce and Plaintiffs could reasonably be expected as a regular part of their duties to drive one of Defendant's interstate routes. A reasonable expectation means that there is more than a remote possibility. *See Garcia v. Pace Suburban Bus Serv.,* 955 F.Supp. 75, 77 (N.D.Ill.1996) ("Pursuant to a notice of interpretation, 46 Fed.Reg. 37,902, 37,903 (1981) . . . jurisdiction extends only to drivers who reasonably could be expected to make one of the carrier's interstate runs, and that means more than a remote possibility.") (citing *Reich,* 33 F.3d at 1156 & n. 4); *see also Chao,* 214 F.Supp.2d at 1274–75 (quoting *Garcia,* 955 F.Supp. at 77); *Reich,* 33 F.3d at 1156 ("If jurisdiction is claimed over a driver who has not driven in interstate commerce, evidence must be presented that the carrier has

engaged in interstate commerce and that the driver could reasonably have been expected to make one of the carrier's interstate runs.") (quoting 46 Fed.Reg. 37,902, 37,903 (1981)); *see also Fleetwood Limousine,* 511 F.Supp.2d at 1240; *Morrison,* 474 F.Supp.2d at 1309–10; *Lieberman,* 2005 WL 5501491, at *2; *Mason,* 2005 WL 5395338, at *2.

In determining the applicability of the motor carrier exemption where the defendant was a carrier whose transportation of passengers was subject to the Secretary's jurisdiction under the Motor Carrier Act, but the plaintiff had "not been called upon to drive interstate routes in the past," the court in *Garcia v. Pace* considered that factor alone to "weigh[ ] against the enforcement of the exemption," but also considered the following additional factors, which, altogether weighed in favor of a determination that the exemption applied: (1) the employer was engaged in interstate commerce; (2) upon hiring, the employer required the employee to sign a form acknowledging that he or she may be called upon to drive for the company's interstate charter service; (3) the employer required its drivers to comply with the FMSCR and maintain USDOT forms; (4) the employer maintained vehicles in accordance with ICC regulations; and (5) the FHA regularly conducted audits in which it determined that all of the employer's drivers are subject to federal safety requirements. *Garcia,* 955 F.Supp. at 77–78 (noting that all of the defendant's drivers conformed to the FMCSR and maintained all required USDOT forms, and that all of the defendant's vehicles were maintained in accordance with ICC regulations, and that, "[m]ore importantly, the Federal Highway Administration regularly performed audits in which it had determined that all the drivers were subject to federal safety requirements," and explaining: "By that we take it to mean that the Secretary of

Transportation has determined that all drivers are within the Secretary's jurisdiction") (citing *Dole v. Circle "A" Construction, Inc.,* 738 F.Supp. 1313, 1322–23 (D.Idaho 1990)); *see also Chao,* 214 F.Supp.2d at 1275 (discussing and applying the *Garcia* factors).

In *Chao v. First Class Coach,* the court found that all of the defendant's drivers were exempt from the FLSA's maximum hours and overtime requirements based on the following evidence: (1) an oral agreement between the defendant and its drivers at the time they were hired that they were expected to be able and available to drive all routes offered by the company; (2) drivers were "sometimes first assigned smaller vehicles driving local routes," but they "routinely move[d] into larger vehicles driving longer routes as part of a typical progression within the company," and "most drivers rotate[d] the types of routes they [drove]"; and (3) the defendant made efforts to comply with federal requirements for interstate drivers, including requiring its drivers to become qualified to drive all types of vehicles used by the company for passenger transportation, maintaining a "driver qualification file" for each driver as required by 49 C.F.R. § 391.51(a), subjecting all drivers to random drug alcohol testing required by the FMCSR, and, to the extent required by the FMCSR, maintaining driver's logs indicating the number of hours each driver works. *Chao,* 214 F.Supp.2d at 1275.

In reaching its conclusion that all the drivers were exempt under the motor carrier exemption, the *Chao* court also noted that the defendant "did not assign its drivers [to interstate routes] indiscriminately," as in *Morris* and *Reich. Id.* at 1275–76. Rather, in *Chao,* the defendant "did try to honor the requests of a few employees that they be assigned only to local routes." *Id.* at 1276. Nevertheless, the *Chao* court concluded, there was "nothing to rebut the assertion that these drivers might at any time be assigned to [an interstate route]." *Id.* The *Chao* court also considered the "percentage of drivers ... concerned compared to [the defendant's] overall operation," noting that the "undisputed evidence reflect[ed] that at most only a handful of [those] drivers ha[d] not driven [interstate routes] during the time period at issue." *Id.* The *Chao* court concluded that it was "obvious that [the defendant] [was] substantially involved in interstate commerce," and that all the defendant's drivers were subject to being called by the defendant to drive an interstate route, even if they had not already been called to do so. *Id.*

■ In this case, the undisputed evidence is that of the sixty-three Plaintiffs in this case, forty-eight (76%), have driven some type of airport or airport-seaport transfer during the period from August 2004 through December 2007. (Def.'s SMF ¶¶ 11 & 16.) Those Plaintiffs have received a total of more than 1,000 such assignments, each of which represents multiple trips to and from the airports and seaports. (Def.'s SMF ¶¶ 11 & 16.) The majority of the Plaintiffs who have not actually driven passengers to and from seaports and airports were employed by Defendant for a short period of time. (Def.'s SMF ¶ 11.) As in *Garcia*—where the employer clearly was engaged in interstate commerce, required its drivers to comply with the FMCSR, and required all its drivers upon hiring to sign a form acknowledging that they may be called upon to drive for the company's interstate charter service—and *Chao*—where the employer clearly was engaged in interstate commerce, required its drivers to comply with federal requirements, and entered into an oral agreement with its drivers at the time they were hired that they were

expected to be able and available to drive all routes offered by the company—here, Defendant clearly is engaged in interstate commerce, and makes extensive efforts to comply with the federal requirements, including requiring its drivers to become qualified to drive all types of vehicles used by Defendant for passenger transportation, maintaining a "driver qualification file" for each driver as required by the federal regulations, subjecting its drivers to random drug alcohol testing as required by the FMCSR, and maintaining logs and other records in accordance with the requirements of the hours of service and regulations governing drivers of vehicles used in interstate commerce.

Moreover, with the exception of Defendant's University shuttle bus drivers, the evidence in the record is that Defendant's drivers are assigned to jobs on a rotating basis. Defendant calls on its drivers to do all different types of work, and upon hiring, Defendant requires its drivers to sign a form acknowledging that they are expected to be able to drive "various jobs, hours and shifts (local & out of town)."[18] Further, the evidence demonstrates that with the exception of Defendant's University shuttle bus drivers, if a driver refuses to perform an assignment without good cause, the refusal is grounds for discipline or being fired.

The Court finds that, based on this undisputed evidence, with the exception of Defendant's University shuttle bus drivers, all Defendant's drivers could reasonably be expected to drive Defendant's airport-to-seaport and seaport-to-airport routes, which the Court has found to be movement in interstate commerce within the meaning of the Motor Carrier Act. Moreover, al-though drivers with seniority are given preference with respect to which routes they will drive, the Court finds that, based on the undisputed evidence in the record, these drivers could, nevertheless, reasonably be expected to drive the airport-to-seaport and seaport-to-airport routes.

■ However, with respect to Defendant's University shuttle bus drivers, a genuine issue of material fact exists as to whether these drivers could reasonably be expected to make out of State or airport-to-seaport and seaport-to-airport trips. There is evidence that the University shuttle bus drivers are part of the regular driving pool and may be asked to do general charter work, including trips across the State line or airport-to-seaport and seaport-to-airport runs, but Plaintiffs have also submitted evidence that although the University shuttle bus drivers may be asked to do general charter work, they are not required to perform these assignments and are free to turn them down. The record also is unclear with respect to whether some or all of the University shuttle bus drivers signed either of the hiring standards forms. The Court finds that this evidence raises a factual issue concerning whether the University shuttle bus drivers could reasonably be expected to drive routes in interstate commerce. *See Morrison*, 474 F.Supp.2d at 1311; *Garcia*, 511 F.Supp.2d at 1242; *Mason*, 2005 WL 5395338 at *3.

Accordingly, with the exception of Defendant's University shuttle bus drivers, the Court finds that all Defendant's drivers are exempt from the FLSA's overtime wage requirements because they were or continue to be employed by a carrier whose transportation of passengers is sub-

---

**18.** The revised version of the hiring standards form, which became effective sometime in 2006, requires Defendant's drivers, upon hiring, to acknowledge that they would be able to work "various jobs, hours, shifts (local & out of town) and be willing and able to drive interstate routes."

ject to the Secretary's jurisdiction under the Motor Carrier Act, and they were or continue to be engaged in activities of a character directly affecting the safety of operation of motor vehicles in interstate or foreign commerce within the meaning of the Motor Carrier Act. *See* 29 C.F.R. § 782.2; 29 U.S.C. § 213(b)(1).

3. *Defendant's Transportation of Passengers on Airport–to–Seaport and Seaport–to–Airport Routes is Within the Motor Carrier Act's Incidental to Air Exemption, 49 U.S.C. § 13506(a)(8)(A); However, the Incidental to Air Exemption Has No Effect on the Secretary's Power, as Described in 29 U.S.C. § 213(b)(1), to Establish Qualifications and Maximum Hours of Service Pursuant to the Provisions of 49 U.S.C. § 31502*

The Court addresses Plaintiffs argument that, nonetheless, because Defendant's transportation of passengers between seaports and airports falls within the Motor Carrier Act's incidental to air exemption, Defendant's employees are subject to the FLSA's overtime requirements.

The Motor Carrier Act's incidental to air exemption provides: "Neither the Secretary nor the Board has jurisdiction under [Part B of Subtitle IV of Title 49] over ... transportation of passengers by motor vehicle incidental to transportation by aircraft." 49 U.S.C. § 13506(a)(8)(A). The applicable regulations explain that the "transportation of passengers by motor vehicle is transportation incidental to transportation by aircraft provided (1) that it is confined to the transportation of passengers who have had or will have an immediately prior or immediately subsequent movement by air and (2) that the zone within which motor transportation is inci-

dental to transportation by aircraft ... shall not exceed in size the area encompassed by a 25–mile radius of the boundary of the airport at which the passengers arrive or depart...." 49 C.F.R. § 372.117(a)(2).

Defendant provides airport-to-seaport and seaport-to-airport motor transportation for cruise line passengers, to and from Miami and Fort Lauderdale airports to and from the Port of Miami and Port Everglades in Fort Lauderdale, immediately prior or immediately subsequent to movement by air. The parties do not dispute that the distance between these airports and seaports does not exceed a twenty-five mile radius "as the crow flies," although the distance by road between these airports and seaports is longer than twenty-five miles. Defendant argues that for purposes of determining the applicability of the Motor Carrier Act's incidental to air exemption, the distance from the airports to the seaports should be measured by surface miles, using surface transportation over public streets, roads and highways. Plaintiffs argue that the distance from the airports to seaports should be measured in terms of the radius from the relevant airports, "as the crow flies."

As the Court has already noted, the applicable regulation states: "the zone within which motor transportation is incidental to transportation by aircraft ... shall not exceed in size the area encompassed by a 25–mile radius of the boundary of the airport at which the passengers arrive or depart...." 49 C.F.R. § 372.117(a)(2). The regulation clearly contemplates that the distance should be measured in terms of the radius from the relevant airports, "as the crow flies," and not by surface miles, using surface transportation over public streets, roads, and

highways.[19] Accordingly, because Defendant's provision of motor transportation for cruise line passengers, to and from Miami and Fort Lauderdale airports to and from the Port of Miami and Port Everglades in Fort Lauderdale, is immediately prior or immediately subsequent to movement by air, and the parties do not dispute that the distance between these airports and seaports does not exceed a twenty-five mile radius, the Court finds that Defendant's transportation of passengers on airport-to-seaport and seaport-to-airport routes is within the incidental to air exemption, 49 U.S.C. § 13506(a)(8)(A).

■ Plaintiffs argue that because Defendant's transportation of passengers on airport-to-seaport and seaport-to-airport routes is within the Motor Carrier Act's incidental to air exemption, the Secretary does not have jurisdiction over such transportation, and thus, the FLSA's motor carrier exemption does not apply. Whereas, Defendant argues—and for the reasons that follow, this Court agrees—that the

Motor Carrier Act's incidental to air exemption has no effect on the Secretary's power, as described in 29 U.S.C. § 213, to set qualifications and maximum hours of service for drivers pursuant to the provisions of 49 U.S.C. § 31502.

By way of background, as noted above, the FLSA's motor carrier exemption applies to any employee for whom the Secretary has power to establish qualifications and maximum hours of service for drivers pursuant to the provisions of section 31502 of Title 49, which is within Part B of Subtitle VI of Title 49. 29 U.S.C. § 213(b)(1). As relevant to this action, section 31502 of Title 49 limits the application of section 31502 to transportation described in section 13501 of Title 49.[20] 49 U.S.C. § 31502. Section 13501 of Title 49, which is within Part B of Subtitle IV of Title 49, gives the Secretary jurisdiction, as specified in Part B, Subtitle IV of Title 49, over interstate transportation as described in section 13501.[21] 49 U.S.C.

---

**19.** The Court notes that the common meaning of "radius" is "a line segment that joins the center of a circle with any point on its circumference," or "a measure of circular area or extent." The American Heritage Dictionary (2d College ed.1985). In contrast to 49 C.F.R. § 372.117(a)(2), the Court notes that the regulation defining the 75–mile exemption set forth in the Family and Medical Leave Act states that the "distance is measured by surface miles," and that the 75–mile distance is not defined as a 75–mile radius; rather, it is defined as a 75–mile distance. *See* 29 C.F.R. § 825.111(b), *held invalid on other grounds*, *Harbert v. Healthcare Services Group, Inc.*, 391 F.3d 1140, 1142 (10th Cir.2004).

**20.** Section 31502 provides:
(a) Application.—This section applies to transportation—
(1) described in sections 13501 and 13502 of this title
\* \* \*
(b) Motor carrier and private motor carrier requirements.—The Secretary of Transportation may prescribe requirements for—

(1) qualifications and maximum hours of service of employees of, and safety of operation and equipment of, a motor carrier; and
(2) qualifications and maximum hours of service of employees of, and standards of equipment of, a motor private carrier, when needed to promote safety of operation.

**21.** As set forth in note 7, *supra*, section 13501 provides, in full, as follows: The Secretary and the Board have jurisdiction, [as specified in Part B of Subtitle IV of Title 49], over transportation by motor carrier and the procurement of that transportation, to the extent that passengers, property, or both, are transported by motor carrier—
(1) between a place in—
(A) a State and a place in another State;
(B) a State and another place in the same State through another State;
(C) the United States and a place in a territory or possession of the United States to the extent the transportation is in the United States;
(D) the United States and another place in the United States through a foreign country

§ 13501. Section 13506(a)(8)(A) exempts from the Secretary's jurisdiction under Part B of Subtitle IV of Title 49 motor transportation that is incidental to transportation by air. 49 U.S.C. § 13506(a)(8)(A).

Plaintiffs argue that because (1) section 31502 applies to the transportation described in section 13501, and (2) section 13501 gives the Secretary jurisdiction as specified in Part B, Subtitle IV of Title 49, over interstate transportation as described in section 13501, then (3) the Secretary's power to establish qualifications and maximum hours of service pursuant to section 31502 is contingent upon the scope of the Secretary's jurisdiction as specified in Subtitle IV, Part B, of Title 49. However, Plaintiffs' argument lacks merit because contrary to Plaintiffs' interpretation of the statute, section 31502 does not incorporate the exemptions from the Secretary's jurisdiction contained in Part B of Subtitle IV of Title 49, such as the "incidental to air" exemption contained in section 13506(a)(8)(A); rather, section 31502 merely incorporates the types of transportation described in section 13501. In other words, section 31502 incorporates by reference only section 13501's description of interstate transportation and *not* any of the exemptions. Therefore, while the incidental to air exemption contained in section 13506 affects the Secretary's jurisdiction under Subtitle IV, Part B, it does not affect the applicability of section 31502 to all of the types of transportation described in section 13501.

While the Court's foregoing conclusion is based on reading the plain language of the statute, the Court also notes its agreement with, and adopts, the Second Circuit's analysis in *Bilyou v. Dutchess Beer Distributors, Inc.,* 300 F.3d 217 (2d Cir.2002). In *Bilyou,* the court found that another exemption—the primary business exemption, found at 49 U.S.C. § 13505—had "no bearing on the Secretary's power, as described in 29 U.S.C. § 213(b)(1) to 'establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49,'" because section 13505 limits the Secretary's jurisdiction "under this part," which, the *Bilyou* court found concerns only the economic and licensing authority conferred by Part B of Subtitle IV of Title 49, and has no effect on the Secretary's safety regulation and operating authority pursuant to section 31502, which is found in Part B of Subtitle VI of Title 49.[22] *Bilyou,* 300 F.3d at 226 ("The

to the extent the transportation is in the United States; or
(E) the United States and a place in a foreign country to the extent the transportation is in the United States; and
(2) in a reservation under the exclusive jurisdiction of the United States or on a public highway.
49 U.S.C. § 13501.

22. The Court notes that in reaching this determination, the *Bilyou* court looked at the "history and purpose of precursor provisions in the MCA," from which it clearly appears that the incidental to air exemption has always been an exemption from economic regulation only. *See Bilyou,* 300 F.3d at 226; *see also Kimball,* 131 M.C.C. at 916 ("The subsidiary question presented by petitioner (whether pe-

titioner's operation, assuming it is in interstate commerce, is nonetheless exempt from the [STB's] *economic regulation* [pursuant to the incidental to air exemption] ) is irrelevant to the issue of the character of the commerce [as interstate or intrastate].") (emphasis added); *Air Dispatch, Inc. v. United States,* 237 F.Supp. 450, 451–52 (E.D.Pa.1964) ("This service [rendered by the plaintiffs at either or both ends of the line-haul movement of goods by the airline] is exempt from *economic regulation* by the I.C.C. where the collection or delivery is a part of the continuous movement of goods in air transportation on a through bill of lading issued by a direct carrier or the air freight forwarder [pursuant to the old incidental to air exemption contained in § 203(b)(7) of the Interstate Commerce Act].") (emphasis added); *City of Philadelphia*

fact that § 13505 denies the Secretary power to prescribe economic and licensing regulations of the sort covered in Subtitle IV, Part B, in no way contradicts the Secretary's authority, established in a different part of the Motor Carrier Act, to set qualifications and maximum hours of service for drivers to promote safety of operations."); *see also Dauphin v. Chestnut Ridge Transp., Inc.,* No. 06 Civ. 2730, 2008 WL 793612 (S.D.N.Y. Mar. 26, 2008) (applying *Bilyou,* and explaining that the "operative language of section 13506 is identical to that of the section 13505 exemption addressed in *Bilyou,* in that both purport to limit the Secretary's jurisdiction only 'under this part,'" and finding that "the effect of the two provisions on the motor carrier exemption should [not] be different").

The Court also notes Plaintiffs' reliance on *Mielke v. Laidlaw Transit, Inc.,* 102 F.Supp.2d 988, 992 (N.D.Ill.2000) (finding that "the FLSA applies to a motor carrier's employees when those employees are excepted from the Transportation Department's jurisdiction, whether by operation of statute or regulation"). However, the Court is not persuaded by the *Mielke* court's analysis, which contradicts this Court's reading of the statute. *See also King v. Asset Appraisal Servs., Inc.,* 470 F.Supp.2d 1025, 1031 (D.Neb.2006) (rejecting *Mielke* ).

In view of the Court's foregoing analysis and conclusions, the Court also notes that this case is distinguishable from *Spires v. Ben Hill County,* 980 F.2d 683 (11th Cir. 1993), upon which Plaintiffs also rely. In *Spires,* the Eleventh Circuit determined, based on both the ICC's decision in *Lonnie W. Dennis,* 63 M.C.C. 66 (1954), and on the FMSCR, 49 C.F.R. § 390.3(f)(4)-(5),

that the Secretary has no jurisdiction over ambulance and rescue services, and that therefore, the motor carrier exemption to the FLSA's overtime requirements did not apply to employees providing such services. *Spires,* 980 F.2d at 686–87 (quoting the FMCSR at 49 C.F.R. § 390.3(f)(3)-(4), which expressly except "[t]he transportation of human corpses or sick and injured persons" from the jurisdiction of the Motor Carrier Act).

However, *Spires* did not involve the same issue of statutory interpretation now before this Court. In holding that ambulance and rescue services are not subject to the USDOT's jurisdiction under the Motor Carrier Act, the *Spires* court did not address the issue of whether the exemptions from the Secretary's jurisdiction contained in Part B of Subtitle IV of Title 49—*e.g.* the "incidental to air exemption" in section 13506(a)(8)(A)—have any effect on the Secretary's power, as described in 29 U.S.C. § 213, to set qualifications and maximum hours of service for drivers pursuant to the provisions of 49 U.S.C. § 31502. Thus, *Spires* does not preclude this Court from finding, as set forth above, that while the incidental to air exemption contained in section 13506 affects the Secretary's jurisdiction under Subtitle IV, Part B, it does not affect the applicability of section 31502 to all of the types of transportation described in section 13501, and therefore has no effect on the Secretary's power, as described in 29 U.S.C. § 213, to set qualifications and maximum hours of service for drivers pursuant to the provisions of 49 U.S.C. § 31502.

## MINIMUM WAGE CLAIMS

Defendant moves for summary judgment on Plaintiffs* claim that Defendant

---

v. *Civil Aeronautics Bd.,* 289 F.2d 770 (D.C.Cir.1961) ("Whether the Philadelphia–Newark truck haul should be considered as incidental to air transportation within the

meaning of the Interstate Commerce Act, and thereby exempt from *economic regulation* under that statute, is a matter for the Interstate Commerce Commission.") (emphasis added).

failed to compensate them at or above the minimum wage. The record contains the following evidence relevant to this claim:

Plaintiff Charlene Blackshear testified during her deposition that she regularly drove a route from Florida City to Marathon and back, and that she received a flat fee of between $130 and $140 to drive the route. (Blackshear Dep. 26–34, Nov. 19,-2007.) Blackshear testified that she would work a total of thirteen or fourteen hours on the days that she drove these routes. However, notwithstanding the fact that this flat fee arrangement would admittedly break down to approximately $10 per hour, according to Blackshear, she was paid the flat rate of $130 to $140 only for the hours between 3:00 p.m., when she would leave Florida City at the start of her route, and approximately 2:45 a.m., when she would return the bus to Defendant. (Blackshear Dep., 26–34, Nov. 19, 2007.) Blackshear testified that she was not being paid for the hours between 12:45 p.m., when she would sign in with Defendant and drive to Florida City, and 3:00 p.m., when she would leave Florida City at the start of her route. (Blackshear Dep. 26–34, Nov. 19, 2007.)

■ Plaintiff Teddy Barrett has provided a sworn statement that during the weekly pay period ending on April 12, 2007, he had one driving assignment, involving the transportation of passengers from Port Everglades to Bayside and back, and that he worked a total of approximately 9.5 hours, for which he was paid a total of $36.00. (Barrett Affirmation ¶ 3.)

Plaintiffs have failed to produce any other evidence that they were compensated at an effective hourly rate below the federal minimum wage requirement set forth in 29 U.S.C. § 206.

Nonetheless, Plaintiffs argue the Court should deny summary judgment on this claim because they have presented evidence that the drivers' logbooks are not an accurate reflection of the hours its drivers actually work. Also Defendant admits that it keeps track of the hours its drivers work by its drivers' logbooks, which Defendant keeps for six months, and its "boards," which do not show all the actual hours worked by the drivers. (Pls.' SMF ¶ 7.)

The FLSA requires that employers pay employees a minimum wage, establishes a maximum number of hours that an employee can work at a regular pay rate, and requires overtime pay for hours worked in excess of the maximum. 29 U.S.C. §§ 201 *et seq.* The federal minimum wage during the period from September 1, 1997 through July 20, 2007 was $5.15 per hour. *Id.* at § 206(a)(1). As of July 20, 2007 the minimum wage is $5.85 per hour. *Id.* The United States Supreme Court has defined "regular rate" as referring to the "hourly rate actually paid the employee for the normal, non-overtime workweek for which he is employed." *Walling v. Youngerman–Reynolds Hardwood Co.,* 325 U.S. 419, 65 S.Ct. 1242, 89 L.Ed. 1705 (1945).

The Department of Labor (DOL) has adopted this definition and stated that the regular rate cannot be less than the minimum wage. 29 C.F.R. §§ 778.107–108. The DOL has stated that the "regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid." *Id.* at § 778.109.[23] *See also*

23. 29 C.F.R. § 778.109 provides in relevant part: "The 'regular rate' under the Act is a rate per hour. The Act does not require employers to compensate employees on an hourly rate basis; their earnings may be determined on a piece-rate, salary, commission, or

*Klinedinst v. Swift Investments, Inc.,* 260 F.3d 1251, 1256 (11th Cir.2001) (explaining that the regular rate of pay is calculated by dividing all of the employer's total compensation for the workweek by the number of hours worked).

■ The effective hourly rate for determining minimum wage violations is calculated by dividing the amount of compensation paid during a workweek by the total number of hours the employee worked during that workweek. In other words, it is the workweek as a whole rather than each individual hour within a workweek that is the relevant unit for determining compliance with the minimum wage requirement. *See, e.g., Posely v. Eckerd Corp.,* 433 F.Supp.2d 1287, 1308 (S.D.Fla. 2006) (granting summary judgment for employer in minimum wage claim where plaintiffs conceded "that when dividing their total weekly compensation by the total number of hours they worked in any given week, they never received less than $5.15 per hour"); *see also United States v. Rosenwasser,* 323 U.S. 360, 363–64, 65 S.Ct. 295, 89 L.Ed. 301 (1945) (approving the averaging of earnings over a standard workweek to determine whether minimum wage law has been violated); *Overnight Motor Tranp. Co. v. Missel,* 316 U.S. 572, 580 n. 16, 62 S.Ct. 1216, 86 L.Ed. 1682 (1942) *superseded by statute on other grounds* (holding that to determine whether minimum wage law has been violated, one must divide total weekly pay received by total number of hours worked); *Dove v. Coupe,* 759 F.2d 167, 168 (D.C.Cir.1985); *Roland Elec. Co. v. Black,* 163 F.2d 417, 420–21 (4th Cir.1947); *Hutson v. Rent–A–Center, Inc.* 209 F.Supp.2d 1353, 1359–60 (M.D.Ga.2001); *Marshall v. Sam Dell's*

*Dodge Corp.,* 451 F.Supp. 294, 302 (N.D.N.Y.1978).

■ An employee who brings a lawsuit under the FLSA for unpaid minimum wages or unpaid overtime compensation and liquidated damages bears the initial burden of proving that he performed the work for which he was not properly compensated. *Santelices v. Cable Wiring,* 147 F.Supp.2d 1313, 1328 (S.D.Fla.2001) (citing *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687–88, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946), *superceded by statute on other grounds as stated in Carter v. Panama Canal Co.,* 463 F.2d 1289, 1293 (D.C.Cir. 1972)). In *Mt. Clemens,* the Court recognized that "[w]hen the employer has kept proper and accurate records the employee may easily discharge his burden by securing the production of those records," but "where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes a more difficult problem arises." 328 U.S. at 687, 66 S.Ct. 1187. The *Mt. Clemens* Court held that in "such a situation ... an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.; see Leonard v. Carmichael Properties & Management Co.,* 614 F.Supp. 1182, 1186 (S.D.Fla.1985) ("A prima facie case can be made through an employee's testimony giving his recollection of hours worked, although the court need not accept every element of the plaintiff's case simply because the employer fails to produce records. A FLSA case is not to be dismissed nor should recovery be denied because proof of the number of

other basis, but in such cases the overtime compensation due to employees must be computed on the basis of the hourly rate derived

therefrom, and, therefore, it is necessary to compute the regular hourly rate of such employees during each workweek.... "

hours worked is inexact or not perfectly accurate. Where the inaccuracy is due to the employer's failure to keep adequate records as required by statute, and the employee has demonstrated that *some* work was performed for which he was improperly compensated, there is a right to recovery, even though the amount may be uncertain and damages difficult to calculate.") (citations omitted); *Brock v. Norman's Country Market, Inc.*, 835 F.2d 823, 828 (11th Cir.1988) ("It is firmly established where an employer has not kept adequate records of their employee's wages and hours as required by the FLSA, the employees will not be denied a recovery of back wages on the ground that their uncompensated work cannot be precisely determined.") (citations omitted).

With the exception of the affirmation of Teddy Barrett, the Court agrees with Defendant that Plaintiffs have failed to present any evidence whatsoever that they were compensated at an effectively hourly rate below the federal rate of $5.15 per hour in violation of the FLSA's minimum wage requirement. Where, as here, the employer fails to keep adequate time records, the employee still must be able to prove that he or she has in fact performed work for which he or she was improperly compensated, and may do so by producing sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. Even under this standard, the Court finds that Plaintiffs have failed to present any genuine issue for trial as to any Plaintiff other than Teddy Barrett.

Accordingly, Defendant's motion for summary judgment in its favor as to Plaintiffs' minimum wage claim should be granted, except as to Plaintiff Teddy Barrett. Genuine issues of material fact remain as to whether Plaintiff Teddy Barrett was compensated at an effectively hourly rate below the federal rate of $5.15 per hour. *See Mt. Clemens Pottery Co.*, 328 U.S. at 687–88, 66 S.Ct. 1187 (explaining that where an employee carries out his or her burden by proving that he or she has in fact performed work for which he or she was improperly compensated, the "burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence").

## STATUTE OF LIMITATIONS

■ Plaintiff moves for summary judgment on Defendant's fourth affirmative defense—that any violation on its part of the FLSA was not willful. The "statute of limitations for claims seeking unpaid overtime wages [or minimum wages] generally is two years [after the cause of action accrued], but if the claim is one 'arising out of a willful violation,' another year is added to it." *Alvarez Perez v. Sanford–Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1162 (11th Cir.2008) (quoting 29 U.S.C. § 255(a)). "To establish that the violation of the Act was willful in order to extend the limitations period, the employee must prove by a preponderance of the evidence that his employer either knew that its conduct was prohibited by the statute or showed reckless disregard about whether it was." *Id.* at 1162–63 (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988)). As defined by the Code of Federal Regulations, "reckless disregard" is the "failure to make adequate inquiry into whether conduct is in compliance with the Act." *Id.* at 1163 (quoting 5 C.F.R. § 551.104). The "three-year statute of limitations may apply even when the employer did not knowingly violate the FLSA; rather, it may apply when it simply disregarded the possibility that it

might be violating the FLSA." *Allen v. Bd. of Public Ed.,* 495 F.3d 1306, 1324 (11th Cir.2007). "If an employer acts unreasonably but not recklessly in determining its legal obligation under the FLSA, then its actions should not be considered willful and the two-year statute of limitations should be applied." *Id.* (citations omitted). "The determination of willfulness is 'a mixed question of law and fact.' " *Id.* The law is unclear in the Eleventh Circuit as to whether the determination of willfulness for purposes of ascertaining the statute of limitations period is to be decided by the jury. *Id.* at 1163 & n. 3. Indeed, in *Alvarez Perez,* the Eleventh Circuit indicated that it may be a decision either for the judge or the jury. *Id.*

Plaintiffs argue that the Court should find as a matter of law that Defendant's actions giving rise to their FLSA claim were willful, and that therefore the three-year statute of limitations should apply. However, with the exception of Plaintiff Teddy Barrett and any Plaintiffs who are or were University shuttle bus drivers, the Court has determined that Defendant has not violated the FLSA. The only remaining questions of fact as to the issue of Defendant's FLSA violations are whether Plaintiff Teddy Barrett was compensated at an effective hourly rate below the federal minimum wage, and whether any Plaintiffs who are or were University shuttle bus drivers could reasonably be expected to make trips across the State line or to drive airport-to-seaport and seaport-to-airport routes. Thus, the Court cannot make a determination on the issue of willfulness until the issue of Defendant's violation of the FLSA is determined. *See Allen,* 495 F.3d at 1324 (concluding that because "triable issues of fact remain[ed] as to some of

[the p]laintiffs' claims that they worked overtime without compensation ... a determination of which statute of limitations to apply must be reserved until it is determined whether a violation of the FLSA occurred").[24]

## LIQUIDATED DAMAGES

Plaintiff also moves for summary judgment on the issue of their entitlement to liquidated damages. The FLSA provides that "[a]ny employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). However, "the Portal–to–Portal Act ... provides a good faith defense to employers to an award of liquidated damages 'if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA].' " *Spires,* 980 F.2d at 689 (quoting 29 U.S.C. § 260). "If a court determines that an employer has established a good faith defense, it may, 'in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of [Title 29].' " *Id.* The Eleventh Circuit has articulated the following standard for establishing a good faith defense:

An employer who seeks to avoid liquidated damages bears the burden of proving that its violation was "both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon him more than a com-

---

**24.** The Court notes that as to Teddy Barrett's claim, such a determination is irrelevant because Barrett filed his minimum wage claim within two years after his cause of action accrued.

pensatory verdict." An employer who knew or had reason to know that the FLSA applied, could not establish good faith as a defense.... Liquidated damages are mandatory absent a showing of good faith.

*Id.* (quoting *United States v. McKennon,* 814 F.2d 1539 (11th Cir.1987) and citing 29 C.F.R. § 790.13–.22). The FLSA "assigns to the judge the role of finding whether the employer acted in subjective and objective good faith for liquidated damages purposes." *Alvarez Perez,* 515 F.3d at 1163 (citing 29 U.S.C. § 260). As set forth above, with the exception of Plaintiff Teddy Barrett, and any Plaintiffs who are or were University shuttle bus drivers, the Court has determined that Defendant has not violated the FLSA. A determination as to Defendant's good faith for purposes of deciding liquidated damages as to Teddy Barrett's minimum wage claim and the overtime ·wages claims of any Plaintiffs who are or were University shuttle bus drivers, is premature insofar as the issue of Defendant's violation of the FLSA has yet to be determined.

## FLORIDA WHISTLE–BLOWER'S ACT CLAIMS

■ Defendant moves for summary judgment on Plaintiffs' claims that they were terminated in violation of Florida's Whistle–Blower's Act, §§ 448.101–05. However, the Court declines to exercise supplemental jurisdiction over these claims.

As a general rule, "the federal courts' original jurisdiction over federal questions carries with it jurisdiction over state law claims that 'derive from a common nucleus of operative fact,' such that 'the relationship between [the federal] claim and the state claim permits the conclusion that the entire action before the court comprises just one constitutional case.'" *City of Chi-*

*cago v. Int'l College of Surgeons,* 522 U.S. 156, 164–65, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997). Congress has codified those principles in the supplemental jurisdiction statute, 28 U.S.C. § 1367, which provides, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *Id.* at 165, 118 S.Ct. 523 (quoting 28 U.S.C. § 1367(a)). "That provision applies with equal force to cases removed to federal court as to cases initially filed there; a removed case is necessarily one 'of which the district courts ... have original jurisdiction.'" *Id.* (citations omitted). "Once subject matter jurisdiction exists, a district court has constitutional authority to hear related state claims ˙even if the federal claim is later dismissed...." *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.,* 210 F.3d 1207, 1222 (10th Cir.2000).

The exercise of supplemental jurisdiction is discretionary. *Int'l College of Surgeons,* 522 U.S. at 172, 118 S.Ct. 523. A federal district court may decline to exercise supplemental jurisdiction over a state law claim if:

(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). The Court finds that Plaintiffs* claims that they were terminated in violation of Florida's Whistle–Blower's Act, involve novel issues of State law.

Specifically, the issue of whether Plaintiffs engaged in statutorily protected activity under the Florida Whistle–Blower act by objecting to, or refusing to participate in, an actual violation of a law, rule, or regulation by Defendant raises novel questions under Florida law. Thus, pursuant to 28 U.S.C. § 1367(c)(3), and in consideration of the interests of judicial economy, convenience and fairness to the litigants, this Court declines to exercise supplemental jurisdiction over Plaintiff's Whistle–Blower's Act claims.

## CLAIMS OF CERTAIN OPT–IN PLAINTIFFS ARE BARRED

Plaintiffs do not dispute that opt-in Plaintiffs Marvin Davis, Eduardo Guillen, Edney Joseph, and Reinaldo Mayo performed no work for Defendant in the three years prior to filing their opt-in notices on February 5, 2008. Therefore, these Plaintiffs' claims are time-barred, and must be dismissed with prejudice. 29 U.S.C. §§ 255, 256.

Additionally, Defendant argues that the claims of five other opt-in Plaintiffs—Emmanual Darville, Edith Eugene, Mario Felizola, Victor Perez, and Eduardo Velez (the "Darville Plaintiffs")—are barred under the doctrine of *res judicata*, or claim preclusion, because these Plaintiffs' claims against Defendant for overtime compensation under the FLSA were dismissed with prejudice in *Darville v. American Coach Lines of Miami, Inc.*, Case No. 06–20758–CIV–LENARD–TORRES. Claim preclusion bars a plaintiff from bringing a subsequent lawsuit when four requirements are met: "(1) there must be a final judgment on the merits, (2) the decision must be rendered by a court of competent jurisdiction, (3) the parties, or those in privity with them, must be identical in both suits; and (4) the same

cause of action must be involved in both cases." *Pelletier v. Zweifel,* 921 F.2d 1465, 1501 (11th Cir.1991) (citations omitted). Plaintiffs do not dispute that all four elements are met with respect to the Darville Plaintiffs; rather, Plaintiffs argue that application of the doctrine would be inequitable in this case because, according to Plaintiffs, the Darville Plaintiffs' counsel in *Darville* submitted a stipulated voluntary dismissal with prejudice, dismissing the Darville Plaintiffs' claims without their knowledge. Thus, according to Plaintiffs, although their claims are barred by the *res judicata* doctrine, it would inequitable if they were denied recovery. In this respect, the Court notes that the Darville Plaintiffs may have a malpractice suit against their counsel arising out of the *Darville* action; however with respect to this action, because all four of the requirements for claim preclusion are met, the Darville Plaintiffs' claims are barred by the doctrine of *res judicata,* and must be dismissed with prejudice.

## CONCLUSION

Based on the Court's foregoing analysis and conclusions, it is hereby

ORDERED AND ADJUDGED that the parties' respective motions for summary judgment as to the issue of whether Plaintiffs are exempt from the FLSA's overtime requirements under the motor carrier exemption, 29 U.S.C. § 213(b)(1) are GRANTED IN PART and DENIED IN PART in accordance with this Order. Summary judgment is entered in Defendant's favor as to Plaintiffs' claim for violation of the FLSA's overtime wage provision, 29 U.S.C. § 207, except as to any Plaintiffs who are or were University shuttle bus drivers. Defendant's motion for summary judgment as to Plaintiffs' overtime wage claim with respect to any Plaintiffs who are or were University shuttle

bus drivers is DENIED because genuine issues of material fact remain with respect to those Plaintiffs. It is further

ORDERED AND ADJUDGED that Defendant's motion for summary judgment as to Plaintiffs' minimum wage claim is GRANTED IN PART and DENIED IN PART in accordance with this Order. Summary judgment is entered in Defendant's favor as to Plaintiffs' minimum wage claim, except as to Plaintiff Teddy Barrett. Defendant's motion for summary judgment as to Teddy Barrett's minimum wage claim is DENIED because genuine issues of material fact remain with respect to his claim. It is further

ORDERED AND ADJUDGED that Plaintiffs' motion for summary judgment as to the issue of whether a two-year or three-year statute of limitations applies to Plaintiffs' FLSA claims is DENIED in accordance with this Order. It is further

ORDERED AND ADJUDGED that Plaintiffs' motion for summary judgment as to the issue of whether Defendant is liable for liquidated damages under the FLSA is DENIED in accordance with this Order. It is further

ORDERED AND ADJUDGED that Plaintiffs' Florida Whistle–Blower's Act claims are DISMISSED WITH PREJUDICE in accordance with this Order. It is further

ORDERED AND ADJUDGED that the claims of opt-in Plaintiffs Marvin Davis, Eduardo Guillen, Edney Joseph, Reinaldo Mayo, Emmanual Darville, Edith Eugene, Mario Felizola, Victor Perez, and Eduardo Velez are DISMISSED WITH PREJUDICE in accordance with this Order. It is further

**ORDERED AND ADJUDGED that within fifteen days of the date of entry of this Order, the parties shall submit a joint report identifying each Plaintiff**

**who is or was a University shuttle bus driver as defined in this Order.**

DONE AND ORDERED.